Thomas SCOTT, Jr., Petitioner

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW,**
Respondent.

Commonwealth Court of Pennsylvania.

Submitted Nov. 13, 2014.

Decided Dec. 15, 2014.

Marcus B. Schneider, Pittsburgh, for petitioner.

Marie I. Rivera–Johnson, Pittsburgh, for intervenor Lifesteps, Inc.

BEFORE: DAN PELLEGRINI, President Judge, and RENÉE COHN JUBELIRER, Judge, and MARY HANNAH LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Thomas Scott, Jr., (Claimant) petitions for review of an adjudication of the Unemployment Board of Review (Board) holding that Claimant committed willful misconduct by sending a lengthy e-mail to senior management that contained two sarcastic and insulting comments about Claimant's immediate supervisor. Accordingly, the Board held that Claimant was ineligible for unemployment compensation under Section 402(e) of the Unemployment Compensation Law (Law).[1] Claimant argues that the statements in question did not violate a work rule and, in any case, the e-mail is not what prompted his employer to discharge him. Claimant argues in the alternative that he had good cause for violating the putative work rule. We reverse the Board.

Claimant worked full-time as a residential supervisor at a group home owned and operated by Lifesteps, Inc. (Employer) and had worked there for over four years when he was dismissed on February 21, 2013. Residents of this group home suffer mental health and developmental disabilities. One of Claimant's job responsibilities was to serve on a committee with other employees to develop behavior plans for residents.

---

1. Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, as amended, 43 P.S. § 802(e). It provides, in relevant part, that "[a]n employee shall be ineligible for compensation for any week ... [i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work." 43 P.S. § 802(e).

At issue in this case was the behavior plan for D.H., a resident who demonstrates aggressive behavior. The committee decided, over Claimant's objections, to modify D.H.'s behavior plan to impose more restrictions on him. Claimant complained to Michael Smith, a vice-president in charge of disability services, who directed Claimant to send him a written report by January 7, 2013. On January 10, 2013, Claimant sent a 50–page e-mail to Smith and to Karen Scott Owens, Employer's president and chief executive officer, that presented his concerns about D.H.'s revised behavior plan.[2]

The e-mail offered detailed complaints about several employees, including Jim Schellhammer, a senior director at the group home and Claimant's supervisor. A few hours after receiving the e-mail, Smith called a meeting with Claimant and several other employees, none of whom had participated in the decision to revise D.H.'s behavior plan. Meredith Hayes, a compliance officer for Employer, interrupted Claimant while he was speaking, and Claimant responded angrily. Smith suspended Claimant for his angry reaction. Employer, after an investigation, discharged Claimant on February 21, 2013.

Claimant applied for unemployment compensation, which Employer opposed. In the UC Employer Questionnaire, Employer stated that it discharged Claimant for (1) not cooperating with the behavior plan committee; (2) confronting Schellhammer about D.H.'s behavior plan in front of county representatives; (3) making insulting and derogatory comments about Schellhammer in an e-mail to Smith; (4) verbally abusing Meredith Hayes during the meeting on January 10, 2013; and

(5) verbally abusing a resident by chastising him for singing.

The Altoona UC Service Center denied Claimant benefits for the stated reason that he committed willful misconduct by failing to exercise good judgment, failing to maintain a cooperative attitude and failing to assist in the development of a resident's behavior plan. Claimant appealed, and a hearing was held before a Referee.

At the hearing, Employer repeated the five reasons for Claimant's discharge that it had recited in the UC Questionnaire. This time, Employer treated Claimant's alleged failure to cooperate with the behavior plan committee and confrontation of Schellhammer in the presence of county representatives as a single reason. Employer then added a new reason, *i.e.*, that it discharged Claimant because he did not send the e-mail on January 7, 2013, as directed, but three days later.

The Referee found, as fact, that Employer did not prove that Claimant was uncooperative with the committee members; was verbally abusive at the January 10, 2013, meeting; was verbally abusive to a client; or was insubordinate by submitting his report by e-mail three days late. This left Claimant's two statements in the e-mail report as the reason for Employer's discharge, and those statements have become the focus of this appeal.

Claimant's lengthy e-mail recounted the horrific life story of D.H., 34 years old, who has resided in Employer's group home since 1999. D.H. and his brother were kept locked in dog cages by their parents. In addition, D.H.'s mother physically and sexually abused him. Her abuse culminated in feeding arsenic to D.H., his brother, his father and his grandfather.

---

2. The e-mail is 50 to 69 pages in length, depending on the font size used to print it. For consistency, this opinion cites to the copy of the 50 page e-mail attached to Claimant's reply brief.

All died save D.H., who was left with neurological damage caused by the arsenic. After relating this account of D.H.'s childhood, Claimant's e-mail report turned to criticisms of Schellhammer. Claimant complained that Schellhammer did not appreciate the extent of D.H.'s psychological damage. Specifically, Claimant's e-mail stated:

> I'm sure after hearing about [D.H.'s] childhood, you would assume that he would have terrible psychological trauma. But despite [D.H.'s] fooling various clinical psychiatrists who have done psychological evaluations on him and prescribed him a wide array of psychotropic medications over the years for supposed psychological and neurological disorders, *[Employer's] management has decided that [D.H.] does not have any psychiatric problems or issues. Thank goodness for Jim Schellhammer's expertise,* because [Employer's] Behavioral Support Team may have went in a completely different direction if it weren't for his insights and leadership. Of course [Schellhammer's] not a licensed psychiatrist, but who needs to be whenever you have an associate's degree in occupational therapy from Mount Aloysius? *I'm sure [Schellhammer] probably had some specialized training in psychiatry in the coal mines* that I'm not aware of ... and after all *he is a "Senior Director" [with Employer], who can argue with a fancy job title like that?* I think I heard that [D.H.] may have even kicked [Schellhammer] where it hurts on one occasion, so who better to give us an in-depth analysis of [D.H.'s] behaviors, and to debunk those naive clinical psychiatrists.

Claimant's Reply Brief, E-mail attachment of January 10, 2013, at 2 (ellipsis in original) (emphasis added) (E-mail of 1/10/13 at 2).

At the hearing before the Referee, Smith, who was Schellhammer's supervisor, testified.[3] He explained that in late 2012, Eileen Saltzgiver, a member of the behavior plan committee, complained that Claimant was "stonewalling" the behavior plan for D.H. C.R., Item 12, Notes of Testimony of June 19, 2013, at 9 (N.T. 6/19/13 at 9). Smith then received an e-mail from Claimant complaining that D.H.'s behavior plan was too restrictive and not in his best interests. On January 3, 2013, Smith directed Claimant to state his specific concerns in writing by January 7, 2013.

Smith testified that Claimant's e-mail, while lengthy, was not specific. Accordingly, Smith called a meeting with Claimant, Christopher Duckett, vice-president of human resources, Hayes and Pierce. During the meeting, Hayes interrupted Claimant while he was speaking and remonstrated "let's focus and, you know, let's move forward." *Id.* at 14. Claimant responded, in a loud voice, that he was not to be interrupted; his anger was visible. Smith opined that Claimant's response to Hayes was erratic, "a little scary" and unbecoming of a residential supervisor. Smith believed that Claimant should be discharged for this behavior. Smith also believed that the references in Claimant's e-mail to Schellhammer were defamatory, although he was uncertain that defamation constituted insubordination.

Terri Helfer, who investigated Claimant's work performance after his suspension, testified. She stated that Owens, Employer's president, had advised her that Claimant's suspension was prompted by his "explosive behavior and failing to meet deadlines." *Id.* at 35. Helfer's in-

---

3. Schellhammer died prior to the hearing before the Referee.

vestigation concluded that Employer had cause for Claimant's termination as a result of ten separate incidents, each one "on its own" constituted a firing offense. *Id.* at 37. Helfer testified that Claimant's two "ridiculing" statements about Schellhammer were "the only two statements that I used in the recommendation for the confirmed incident for insubordination in this case." *Id.* at 41. It was Owens who decided to fire Claimant, and she based her decision on five of the ten incidents cited by Helfer.

Claimant testified. He opposed the committee's behavior plan for D.H. because he did not believe it would work or was in D.H.'s interest. Claimant noted practical and safety issues with a punitive approach to D.H.'s aggression; Saltzgiver snickered. She also stated that because D.H. was not attending an offsite daycare program, Employer was losing money. Claimant believed Saltzgiver wanted to return D.H. to the daycare program for financial reasons because D.H. exhibited less aggression at the group home. Claimant testified that he disagreed with the committee's insistence that D.H. walk to the kitchen for his meals and without assistance. Because of his neurological damage, D.H. could not walk up the ramp to the kitchen. In the past, he had crawled up the ramp. However, D.H. has developed bursitis in his knees, and his physician did not want him to crawl. The committee intended to place greater restrictions on D.H., such as taking his electronics if he failed to turn them off at a certain time. The committee also wanted D.H. to sleep in the bedroom, not in the living room. Claimant agreed with this goal, but he wanted to achieve it by using positive reinforcement techniques, which were more effective with D.H. in Claimant's experience.

Claimant was completely frustrated by Schellhammer's statement to the committee that D.H. did not have psychiatric issues, only behavioral ones, and did not require antidepressants. Schellhammer believed that D.H. got his way too often with staff at the group home. Claimant explained that D.H. has been diagnosed with mental illness and mental retardation, in addition to neurological and physical disabilities. Claimant found Schellhammer's belief that Claimant's behavioral issues resulted from his having too much freedom at the group home simply ludicrous. Claimant observed that other employees were afraid to contradict Schellhammer because he was the senior director.

Regarding his comment that Schellhammer received "specialized training in psychiatry in the coal mines," E-mail of 1/10/13 at 2, Claimant stated he was being sarcastic. When asked specifically about the coal mining reference, Claimant testified: "My father and both of my grandfathers worked in the coal mines and I have the utmost respect for them." C.R., Item 14, Notes of Testimony of July 5, 2013 at 48 (N.T. 7/5/13 at 48).

The Referee found that Claimant's e-mail contained "two instances of sarcasm." Referee Decision, Finding of Fact No. 12. The Referee then specified that the first instance consisted of "a statement that the senior director 'received his psychiatry degree in the coal mines' " and the second was the remark " 'who can argue with the senior director when he has a fancy job title like that.' " *Id.*, Finding of Fact No. 13. The Referee concluded that this use of sarcasm and derogatory comments constituted willful misconduct. The Referee denied benefits, and Claimant appealed to the Board. The Board adopted and incorporated that Referee's findings and conclu-

sions and affirmed without further analysis.

Claimant petitioned for this Court's review.[4] On appeal, he argues (1) that Finding of Fact No. 13 is not supported by substantial evidence; (2) that Employer did not establish that the statements in the e-mail constituted insubordination or a work rule violation; (3) that Employer did not establish that the statements in the e-mail were the actual cause of Claimant's dismissal; and (4) that even if the statements constituted a work rule violation, Claimant had good cause for violating the rule.[5] Employer intervened in this appeal and has filed a brief in support of the Board's adjudication. The Board has not filed a brief in this case.

We begin with a review of the law on willful misconduct. Although not defined in the Law, the courts have established that it means the following:

(1) an act of wanton or willful disregard of the employer's interest;

(2) a deliberate violation of the employer's rules;

(3) a disregard of standards of behavior which the employer has a right to expect of an employee; [or]

(4) negligence indicating an intentional disregard of the employer's interest or of the employee's duties and obligations to the employer.

*Altemus v. Unemployment Compensation Board of Review*, 681 A.2d 866, 869 (Pa. Cmwlth.1996). The question of whether conduct rises to the level of willful misconduct is a question of law to be determined by this Court. *PMA Reinsurance Corp. v. Unemployment Compensation Board of Review*, 126 Pa.Cmwlth. 94, 558 A.2d 623, 625 (1989). It is the employer's burden to establish that a claimant's conduct constituted willful misconduct. *Conemaugh Memorial Medical Center*, 814 A.2d at 1288.

Where willful misconduct is based upon the violation of a work rule, the employer must establish the existence of the rule, its reasonableness, and that the employee was aware of the rule. *Bishop Carroll High School v. Unemployment Compensation Board of Review*, 125 Pa. Cmwlth. 302, 557 A.2d 1141, 1143 (1989). Stated another way, "the employer must show the existence of the rule and its *knowing* violation." *BK Foods, Inc. v. Unemployment Compensation Board of Review*, 119 Pa.Cmwlth. 632, 547 A.2d 873, 875 (1988) (emphasis in original). Once an employer makes this showing, the burden shifts to the claimant to prove that the rule was unreasonable or that he had good cause for violating the rule. *Gillins v. Unemployment Compensation Board of Review*, 534 Pa. 590, 633 A.2d 1150, 1156 n. 3 (1993).

Claimant first argues that Finding of Fact No. 13 is not supported by substantial evidence. It states as follows:

In the claimant's 50–plus page email, the claimant made a statement that the senior director "received his psychiatry degree in the coal mines." The claimant also stated sarcastically that "who can argue with the senior director when he has a fancy job title like that."

---

4. On review we determine whether constitutional rights were violated, an error of law was committed or whether necessary findings of fact are supported by substantial evidence. *Shrum v. Unemployment Compensation Board of Review*, 690 A.2d 796, 799 n. 3 (Pa.Cmwlth. 1997). Whether "an employee's action constitutes willful misconduct is a question of law" over which our scope of review is plenary. *Conemaugh Memorial Medical Center v. Unemployment Compensation Board of Review*, 814 A.2d 1286, 1288 (Pa.Cmwlth.2003).

5. Claimant's arguments are recounted in a different order than presented in his brief.

Referee Decision, Finding of Fact No. 13. This quote was taken from Employer's UC Questionnaire, which characterized, not quoted, Claimant's e-mail. *See* C.R., Exhibit 8 at 3. Claimant's e-mail actually stated:

> Of course [Schellhammer's] not a licensed psychiatrist, but who needs to be whenever you have an associate's degree in occupational therapy from Mount Aloysius? I'm sure [Schellhammer] probably had some specialized training in psychiatry in the coal mines that I'm not aware of[.]

E-mail of 1/10/13 at 2.

We agree that Finding of Fact No. 13 does not accurately quote Claimant's actual e-mail. Its deviation from the actual language in the e-mail is subtle. The Referee's version of the e-mail suggests that Claimant was challenging the quality of Schellhammer's degree in psychiatry. However, Claimant's actual point was that Schellhammer did *not* have a degree in psychiatry and, thus, lacked the qualifications to reject the conclusions of D.H.'s treating psychiatrists. The email speaks for itself. However, the variance between the actual language of the email and its characterization in Finding of Fact No. 13 is not consequential. As Employer points out, Claimant admitted that he was sarcastic, which was the point of the Referee's factual findings.

■ In his second issue, Claimant argues that Employer did not establish that sarcastic comments about a supervisor, made not to the supervisor but to senior management, violated a work rule. Claimant further argues that sarcasm cannot be equated with insubordination. The Board did not explain its conclusion of law that Claimant's sarcasm constituted willful misconduct.

Employer counters that the e-mail statements mock the educational background of Schellhammer and belittle his title. Employer also argues that Claimant failed to use "good judgment" or to advance a "harmonious" work environment in violation of Employer's Code of Business Conduct and Ethics. Employer's Brief at 18. Employer points out that Claimant made other sarcastic statements about other employees in the e-mail. For example, he also questioned whether another co-worker had received advanced training "in the coal mines" and stated that even if Schellhammer was promoted to "Grand Supreme Commander" he was still wrong. Employer's Brief at 19–20.

■■ An employer is bound by its stated reasons for an employee's dismissal and cannot raise new reasons at the hearing. *Ductmate Industries, Inc. v. Unemployment Compensation Board of Review,* 949 A.2d 338, 344 n. 5 (Pa.Cmwlth.2008); *see also Walker v. Unemployment Compensation Board of Review,* 2012 WL 8666776, (Pa.Cmwlth., No. 206 C.D.2011, filed January 5, 2012) (holding that an employer is bound by the stated reasons for the dismissal and cannot later offer additional reasons for the dismissal, should the stated reasons not equal willful misconduct). Further, the employer "must prove that the act in question was the actual reason for the claimant's discharge." *Browning–Ferris Industries of Pennsylvania, Inc. v. Unemployment Compensation Board of Review,* 127 Pa.Cmwlth. 323, 561 A.2d 856, 857 (1989) (citing *Panaro v. Unemployment Compensation Board of Review,* 51 Pa.Cmwlth. 19, 413 A.2d 772 (1980)).

In the UC Employer Questionnaire, Employer stated that Claimant's two sarcastic comments about Schellhammer violated the Employee Handbook, Section 10.2(e), which forbids "insubordination, failure to carry out job assignments, and/or use of profane or obscene lan-

guage." C.R., UC Exhibit 9. Helfer also testified that the two statements about Schellhammer's education and job title were "the only two statements that [she] used in the recommendation for the confirmed incident for insubordination in this case." N.T. 6/19/13 at 41. Those are the only statements that can be considered. Simply, Employer's identification of other sarcastic comments Claimant made in his e-mail are irrelevant because they were not the reason for Employer's termination of Claimant's employment.

Employer does not assert that the two statements about Schellhammer are profane, obscene or demonstrate a refusal to carry out a job assignment. Accordingly, the only question is whether they were insubordinate.

Insubordination is defined as

[a] willful disregard of an employer's instructions, esp. behavior that gives the employer cause to terminate a worker's employment . . . [or] an act of disobedience to proper authority; esp., a refusal to obey an order that a superior officer is authorized to give.

BLACK'S LAW DICTIONARY 870 (9th ed. 2009). The common dictionary meaning of the term insubordinate follows:

unwilling to submit to authority . . . disobedience of orders, infraction of rules, or a generally disaffected attitude toward authority. . . .

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1172 (2002). Claimant's conduct did not involve disobedience. Nevertheless, this Court has explained that "[a]n employee's use of abusive, vulgar or offensive language with a superior is a form of insubordination[.]" *Brown v. Unemployment Compensation Board of Review*, 49 A.3d 933, 937 (Pa.Cmwlth.2012).

Claimant cites to *Brown* in support of his claim that his comments did not consti-tute willful misconduct. In *Brown*, the claimant, a battery machine operator, was tasked with ensuring that batteries in need of repair were kept out of circulation. Each battery needing to be repaired was labeled "Do Not Use." *Id.* at 935. The claimant discovered that one of his coworkers had torn the warning sign from an out-of-service battery and attempted to use it. The claimant replaced the ripped sign with two new ones that read "To the moron who can't read do not use this, do not use this battery" and "Not charging you moron" because of the danger of using a battery that needs repair. *Id.* The employer fired claimant when coworkers complained about the signs. The Board found that the use of the word "moron" violated the employer's policy against threatening behavior as well as the standards of conduct every employer has the right to expect of an employee. The claimant appealed to this Court and we reversed.

We explained that when considering whether certain language is abusive, vulgar, or offensive "the context in which the profanity or other proscribed language is used must be considered." *Id.* at 937. Further, willful misconduct "is not proven where use of the proscribed language was provoked or is *de minimis* in nature." *Id.* We concluded that the use of the word "moron" was *de minimis* in nature and provoked by the dangerous negligence of an unknown coworker, who had attempted to charge an inoperable battery, and not *outside the bonds of what one might expect in a busy warehouse.*

*Brown* rests on the principle that when an employee uses vulgar or offensive language when addressing his superior, that choice of words can constitute insubordination. By contrast, here, Claimant did not address his two sarcastic comments to Schellhammer.

Rather, Claimant complained to senior management about its subordinate, Schellhammer. Claimant did so because Schellhammer, who was educated in occupational therapy, not psychiatry, felt free to be dismissive of D.H.'s medical diagnoses. Claimant's frustration led to his use of sarcasm in expressing his criticism of Schellhammer's decision. Notably, the meeting called by Smith was not to discuss the caustic nature of Claimant's writing style but, rather, to discuss the substance of his letter, which was the appropriate behavior plan for D.H.

More importantly, the Board failed to consider the fact that Claimant's statements were not made to Schellhammer or in front of people Schellhammer supervised. They were made to senior management, and they were made silently in a letter. Claimant used sarcasm in his advocacy for D.H. for emphasis and effect in a private letter to two people: Smith and Owens. Claimant did not intend his report to receive general circulation in the workplace. In these circumstances, we cannot infer insubordination.

Employer does not cite authority to support its legal theory that sarcasm, itself, constitutes insubordination. Employer cites to *Grigsby v. Unemployment Compensation Board of Review*, 67 Pa.Cmwlth. 482, 447 A.2d 705 (1982), for the proposition that criticism of an employer, even if deserved, can be disqualifying if inappropriately channeled. The claimant in *Grigsby* protested his working conditions by leaving his workstation during working hours and encouraging his co-workers to do the same, causing a production shutdown. A whistle blower's letter to senior management bears no relation to orchestrating a production shutdown. Indeed, the only proper way for an employee to channel criticism of a superior's decision or conduct is to present that criticism to senior management. This is what Claimant did.

Insubordination may be found where an employee speaks to a superior in an abusive, vulgar or offensive way. The actual language used by Claimant does not meet any of those descriptions. Claimant's two statements were sarcastic, as Claimant acknowledges, but they were not directed to his supervisor. For an employer to forbid sarcasm in the workplace under any circumstances, there must be an explicit rule. In itself, the use of sarcasm cannot be equated to insubordination or any other kind of willful misconduct.

For these reasons, we reverse the order of the Board.[6]

### ORDER

AND NOW, this 15th day of December, 2014, the order of the Unemployment Compensation Board of Review, dated October 15, 2013, is hereby REVERSED.

---

**6.** Because we find that willful misconduct was not established, we need not address Claimant's remaining, issues.