# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Troy McNeil, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Unemployment Compensation | : | |
| Board of Review, | : | No. 955 C.D. 2016 |
| Respondent | : | Submitted: January 20, 2017 |

OPINION NOT REPORTED

MEMORANDUM OPINION
PER CURIAM                                                    FILED: May 1, 2017

Troy McNeil (Claimant) petitions this Court, pro se, for review of the Unemployment Compensation (UC) Board of Review's (UCBR) April 15, 2016 order affirming the Referee's decision denying him UC benefits under Section 402(e) of the UC Law (Law).[1]  There are two issues for this Court's review: (1) whether the UCBR erred by determining that Claimant committed willful misconduct, and (2) whether the UCBR erred by disallowing evidence in support of Claimant's case.[2] After review, we affirm.

---

[1] Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e) (referring to willful misconduct).

[2] In his Statement of Questions Involved, Claimant presented fifteen questions specifically directed to Employer, several of which (*i.e.*, those relating to Claimant's communications and actions on December 31, 2015 and January 1, 2016) are subsumed within the willful misconduct issue.  The other questions Claimant posed were not developed in Claimant's argument. "Arguments not properly developed in a brief will be deemed waived by this Court." *Rapid Pallet v. Unemployment Comp. Bd. of Review*, 707 A.2d 636, 638 (Pa. Cmwlth. 1998).

Claimant also raised three issues expressly addressed to the Referee concerning the conduct of the hearing, one (*i.e.*, whether the Referee disregarded his additional evidence) is subsumed within the second issue, and the other two (*i.e.*, whether Claimant was afforded ample time to present his case, and whether the Referee asked Claimant if he was "thin-skinned") were not developed in Claimant's argument and, thus, are waived. *Rapid Pallet*.

Claimant was employed part-time (approximately 18 hours per week) as a sous chef/cook for Anthony's Catering South, Inc. (Employer) from March 2015 through January 5, 2016, when Employer discharged him. Claimant applied for UC benefits. On January 28, 2016, the Erie UC Service Center determined that Claimant was eligible for UC benefits in accordance with Section 402(e) of the Law. Employer appealed. A Referee hearing was held on March 4, 2016. On March 9, 2016, the Referee reversed the UC Service Center's determination, and denied Claimant UC benefits under Section 402(e) of the Law. Claimant appealed to the UCBR. On April 15, 2016, the UCBR adopted the Referee's findings and conclusions, and affirmed the Referee's decision. Claimant appealed to this Court.[3]

> Initially,
>
> Section 402(e) of the Law provides that an employee is ineligible for unemployment compensation benefits when his unemployment is due to discharge from work for willful misconduct connected to his work. The employer bears the burden of proving willful misconduct in an unemployment compensation case. Willful misconduct has been defined as (1) an act of wanton or willful disregard of the employer's interest; (2) a deliberate violation of the employer's rules; (3) a disregard of standards of behavior which the employer has a right to expect of an employee; or (4) negligence

---

[3] "Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact were unsupported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704." *Turgeon v. Unemployment Comp. Bd. of Review*, 64 A.3d 729, 731 n.3 (Pa. Cmwlth. 2013). However,

> [i]n a case such as this, where the party with the burden of proof succeeds on the merits before the [UCBR], our scope of review is limited to a determination of whether substantial evidence exists in the record to support the [UCBR's] findings and whether any errors of law were committed.

*Fritz v. Unemployment Comp. Bd. of Review*, 446 A.2d 330, 332 (Pa. Cmwlth. 1982).

2

indicating an intentional disregard of the employer's interest or a disregard of the employee's duties and obligations to the employer.

*Dep't of Transp. v. Unemployment Comp. Bd. of Review*, 755 A.2d 744, 747 n.4 (Pa. Cmwlth. 2000) (citation omitted). "If the employer satisfies its burden, the burden shifts to the employee to show that he . . . had good cause for his . . . conduct. 'A claimant has good cause if his . . . actions are justifiable and reasonable under the circumstances.'" *Grand Sport Auto Body v. Unemployment Comp. Bd. of Review*, 55 A.3d 186, 190 (Pa. Cmwlth. 2012) (citation omitted) (quoting *Docherty v. Unemployment Comp. Bd. of Review*, 898 A.2d 1205, 1208-09 (Pa. Cmwlth. 2006)). Ultimately, "[t]he question of whether conduct rises to the level of willful misconduct is a question of law to be determined by this Court." *Scott v. Unemployment Comp. Bd. of Review*, 105 A.3d 839, 844 (Pa. Cmwlth. 2014).

The law is well established that:

[T]he [UCBR] is the ultimate fact-finder in unemployment compensation matters and is empowered to resolve all conflicts in evidence, witness credibility, and weight accorded the evidence. It is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is whether there is evidence to support the findings actually made. Where substantial evidence supports the [UCBR's] findings, they are conclusive on appeal.

*Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Review*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008) (citations omitted). This Court has explained:

Substantial evidence is relevant evidence upon which a reasonable mind could base a conclusion. In deciding whether there is substantial evidence to support the [UCBR's] findings, this Court must examine the testimony in the light most favorable to the prevailing party, in this case, the Employer, giving that party the benefit of any inferences which can logically and reasonably be drawn from the evidence.

3

*Sanders v. Unemployment Comp. Bd. of Review*, 739 A.2d 616, 618 (Pa. Cmwlth. 1999).

Here, the UCBR adopted the Referee's findings that:

2. During this employment [Employer's] Executive Chef [Daniel Brodeur (Brodeur)] treated [] Claimant well and considered [] Claimant to be a [f]riend.

3. On December 31, 2015 [] Claimant was one of three [c]hefs scheduled to service a wedding with 300 [g]uests.

4. Labor at the wedding was intensive because of the number of [g]uests and because [Brodeur] needed [c]hefs to man several food stations.

5. The wedding was scheduled to last until 1:00 a.m.

6. However, at 5:03 p.m. [] Claimant sent [Brodeur] a text message which stated 'I'm going to have to leave at 10:00 [p.m.], I can't break this [f]amily tradition, I already didn't celebrate my [w]ife's birthday with her for the first time in twenty-two years, if you would like to talk pull me out of the [k]itchen and talk to me, sorry for the inconvenience'.

7. Although he needed [] Claimant's help at the wedding, [Brodeur] felt that if he denied [] Claimant's request to leave work in the middle of the wedding, [] Claimant would 'blow up' and engage [Brodeur] in an argument at the wedding.

8. Therefore, [Brodeur] reluctantly gave [] Claimant permission to leave the wedding.

9. On the following day, January 1, 2016, [] Claimant was scheduled to work another wedding.

10. [] Claimant previously agreed to report to work at 1:00 p.m. on January 1, 2016 to help with the wedding.

11. However, at 12:34 p.m. [] Claimant sent [Brodeur] a text message which stated 'I just realized I have an important and personal meeting about my [d]aughter at 2:00 [p.m.], I'll be in right after that'.

4

12. On January 1, 2016 [] Claimant arrived at work at 2:30 p.m.

13. As a result, January 5, 2016 [] Claimant was discharged for insubordination.

Referee Dec. at 1-2.

Claimant argues that he was not insubordinate, but rather was discharged because, instead of addressing two incidents during which catered event guests allegedly made racially-offensive remarks to Claimant, "Employer got rid of the problem."[4]  Claimant Br. at 38.  We disagree.

Employer's Owner/General Manager Giovanni LaRosa (LaRosa) represented that Claimant was discharged because Claimant left work early on December 31, 2015, and also arrived for work late on January 1, 2016 with short notice, thereby leaving Employer "in a very, very bad spot."  Certified Record Item 8, Notes of Testimony, March 4, 2016 (N.T.) at 7.  LaRosa recalled that it was not until he notified Claimant of his discharge on January 5, 2016 that Claimant mentioned his personal issues with the guest comments.  *See* N.T. at 8-9.  LaRosa pronounced: "I'm not here today to dispute . . . what he heard or how he feels.  My objection towards his behavior is . . . leaving us early . . . at a big wedding and coming in late the next day."  N.T. at 8.

---

[4] The UCBR argues that because "[i]t is difficult to discern from [Claimant's] narrative the legal basis of [his] appeal[,] . . . Claimant has not preserved any issues before this Court."  UCBR Br. App. at 6.  However, when it comes to compliance with the Pennsylvania Rules of Appellate Procedure, "this Court is generally inclined to construe *pro se* filings liberally."  *Smithley v. Unemployment Comp. Bd. of Review*, 8 A.3d 1027, 1029 n.6 (Pa. Cmwlth. 2010).  Moreover, this Court has deemed meaningful review of the merits possible when it could discern a pro se appellant's argument, or where the interests of justice require it.  *See Woods v. Office of Open Records*, 998 A.2d 665 (Pa. Cmwlth. 2010).  Thus, we can limit our review to those cognizable arguments we can decipher despite Claimant's inartful brief.  *See Woods*; *Commonwealth v. Adams*, 882 A.2d 496 (Pa. Super. 2005).

With respect to the December 31, 2015 incident, Brodeur explained that although Claimant and he were together earlier in the week, Claimant's text was his first notice of Claimant's request to leave early that evening. Brodeur described:

[Brodeur] I was about 20 feet away from him prepping and that's what I got.

. . . .

R[eferee] Okay. So, what happened? How did you respond?

[Brodeur] Well, I didn't see it at first because . . . we're getting ready to put a mega wedding out. . . . And there was a take-out order going at the back door also because it was New Year's Eve. We were doing another small party at the back. And I happened to glance at my phone. I saw I had a new text message. In the middle of a lot of confusion getting ready for a function, that's what I got. So, no. There was no verbal whatsoever.

R[eferee] Now, . . . did you respond in any kind of way?

[Brodeur] I kind of looked over and said are you kidding me. And at that point, I needed him to produce what I needed him to produce at the time. Yes. We could've got into a conversation. I could've taken him outside. We could've discussed all this but it's time sensitive. It's . . . at least 6:00 before a 7:00 start of a major function with hot and cold hors d'oeuvers, with a seafood station, with a barista station, with a cheesesteak station at the end, with a dessert room and there's only three of us on the . . . kitchen staff as far as Chef goes. The stations were actually Chef-manned stations. [Claimant] was expected[,] though we didn't talk about game plan at this point[,] but expected as far as I'm concerned to be there to help with dessert station and a cheesesteak station that was set to go off -- the dessert station was at 11:00. Cheesesteak station was at 12:00. . . .

R[eferee] Now, did you give [Claimant] permission to leave early?

[Brodeur] Yes. I did . . . , through conversation across the room because I didn't want a confrontation, sir. It's a small kitchen. I didn't want . . .

R[eferee] Well, why . . .

[Brodeur] . . . a confrontation.

R[eferee] . . . didn't you just say we're too busy?

[Brodeur] Because I knew what the response was going to be. It was already told to me there that I'm not missing . . . something else of my wife. There was an incident prior . . . on his wife's birthday that a similar text was sent to me . . . saying that I'm not missing another function. . . . He [was permitted to leave a] little bit early [that time]. . . .

R[eferee] Now . . .

[Brodeur] . . . You know, if this was arranged prior to 5:30 p.m., I maybe could've done something to take the stress off me. You have to understand something -- that an Executive Chef at game time has a lot of stress on him. . . . If there's a problem over here, you deal with the problem over there to try to get the productivity to put a major wedding out.

. . . .

R[eferee] So, you're saying you gave him permission because you felt you didn't have any other choice with . . . .

[Brodeur] I had no choice.

R[eferee] . . . this? Okay.

[Brodeur] Also knowing . . . it was going to get into a confrontation that I did not want to have and did not have time to have at that particular time. It's a very small work environment. . . .

N.T. at 13-14; *see also* N.T. at 40.

Claimant admitted at the Referee hearing that "[he] was aware[ that he] was to work the whole time" on December 31, 2015. N.T. at 18. He testified that he had intended to ask to leave early on December 31, 2015 previously that week but,

7

nevertheless, "didn't give [Employer] prior [notification]." N.T. at 16; *see also* N.T. at 17-18. Claimant also acknowledged that his text *informed* Brodeur that he was "going to have to leave at 10:00," rather than *sought permission* to leave. N.T. Ex. Emp. 1; *see also* N.T. at 27-28. Claimant represented that he was unsure how to ask, since Brodeur berated him in front of the other staff on November 3, 2015 about asking to leave early for his wife's birthday.[5] He also disagreed that Brodeur needed him to stay at the wedding on December 31, 2015, because everything was set up and ready when he left, yet did not dispute that his text apologized "for the inconvenience." N.T. Ex. Emp. 1; *see also* N.T. at 22. Finally, Claimant revealed while questioning Brodeur at the hearing that Brodeur notified Claimant that "next time let me know ahead of time." N.T. at 17.

With respect to Claimant's January 1, 2016 tardiness, Claimant did not dispute Brodeur's testimony that Claimant gave him less than 30 minutes notice that he would be more than an hour late for work. *See* N.T. at 15. He further represented that his presence at work at 1:00 p.m. on January 1, 2016 was not necessary since he worked hard when he arrived at 2:30 p.m., and "[e]verything with that party went out great[.]" N.T. at 23. Claimant and his wife testified that, although Claimant's text stated that the meeting was "important and personal," it was actually an emergency. N.T. at 23; *see also* N.T. Ex. Emp. 2; N.T. at 37-38. Claimant admitted that he did not inform Employer that the January 1, 2016 meeting was an emergency.

Claimant also declared at the hearing that "there was stuff that was going on between [him and Employer] . . . that [Employer had] not spoken about." N.T. at 23. In particular, Claimant described that there had been two incidents in which event guests made racist remarks to him or in his presence, which he reported to

---

[5] Claimant pronounced that he objected to the manner in which Brodeur addressed him in November, but never discussed it with LaRosa. *See* N.T. 19-20.

8

Brodeur.[6] Claimant maintained that since Brodeur did not know how to handle either incident properly, Claimant's employment would have been terminated anyway. *See* N.T. at 24. Claimant acknowledged that, since it was during the argument over the December 31, 2015 racism complaint that Brodeur read Claimant's text about leaving early, Brodeur "told me I could leave because he wanted to smooth" things over. N.T. at 27.

> The UCBR adopted the Referee's conclusions:
>
> The Referee found credible the testimony of [Brodeur] that he granted [] Claimant permission to leave work early, even though he needed [] Claimant to remain at work, because he felt that if he denied [] Claimant permission to leave, [] Claimant would 'blow up' and be argumentative.
>
> . . . .
>
> At the Referee's hearing [] Claimant testified that the [January 1, 2016] meeting he had to attend for his [d]aughter was an 'emergency'. However, that is not what [] Claimant said in his text message. [] Claimant stated that he had to attend [an] 'important' meeting involving his [d]aughter. It was also 'important' that [] Claimant report to work on time to assist in the wedding on January 1, 2016.
>
> At the hearing [] Claimant testified that his [w]ife waited until 12:34 p.m. on January 1, 2016 to tell him about a meeting that was going to occur at 2:00 [p.m.] that day.

---

[6] According to Claimant, the first incident occurred in late November 2015. His station was located on the darker side of the event room. A guest commented about it being darker in Claimant's area. Claimant remarked that his station was more romantic. The guest allegedly replied to Claimant: "[N]o, it's dark over here because you're over here." N.T. at 24. Claimant expressed that when he reported this incident to Brodeur that day, Brodeur shrugged his shoulders. *See* N.T. at 24, 26.

The second incident allegedly occurred during set-up for the December 31, 2015 wedding, when a guest (allegedly Brodeur's friend) picked up an eggplant in Claimant's presence and "started rubbing it [and] talking about poor little moulinyan." N.T. at 25. Claimant testified: "So, when he looked up, he seen me. His eyes got wide like." N.T. at 25. According to Claimant, although moulinyan means "eggplant" in Italian, it has also been used to mean "n***er" in Italian. N.T. at 25. Claimant contends that when he reported this incident to Brodeur, he and Brodeur "had words" because Brodeur refused to then confront the guest about the incident. N.T. at 26.

9

Neither the Claimant nor his [w]ife testified as to why his [w]ife waited until such a late time to inform him of such an important meeting. That being the case, the Referee did not find credible the testimony of [] Claimant or his [w]ife regarding the January 1, 2016 meeting.

Based on the aforestated, the Referee concludes that even though [Brodeur] forgave [] Claimant for leaving him shorthanded at the December 31, 2015 wedding, the Claimant did the same thing the following day by leaving [Brodeur] short at the January 1, 2016 wedding. The Referee does not believe that [] Claimant demonstrated good cause for either one those absences nor did [] Claimant give [Brodeur] sufficient advance notice that he would not be able to work his full shifts those days.

Referee Dec. at 2-3.

Although LaRosa admitted that there is not a specific, written call-off policy, he declared that "[i]t's understood when you're hired that you come in on time and you leave when the job's over." N.T. at 8. LaRosa specifically stated that Claimant "knows you leave when the job's over." N.T. at 12. Even Claimant acknowledged that he was expected to remain at the December 31, 2015 wedding until after it was over at 1:00 a.m. This Court has held that "[a] work rule violation need not be shown where the behavior standard is obvious, and the employee's conduct is so inimical to the employer's best interests that discharge is a natural result." *Tongel v. Unemployment Comp. Bd. of Review*, 501 A.2d 716, 717 (Pa. Cmwlth. 1985); *see also Evans v. Unemployment Comp. Bd. of Review* (Pa. Cmwlth. No. 2419 C.D. 2014, filed December 2, 2015).[7] Certainly, "[a]n employer has the right to expect that his employees will attend work when they are scheduled, that they will be on time and that they will not leave work early without permission." *Fritz v. Unemployment Comp. Bd. of Review*, 446 A.2d 330, 333 (Pa. Cmwlth. 1982); *see*

---

[7] This Court's unreported memorandum opinions may be cited "for [their] persuasive value, but not as a binding precedent." Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

10

*also Ellis v. Unemployment Comp. Bd. of Review*, 59 A.3d 1159, 1163 (Pa. Cmwlth. 2013) ("It is well-settled that an employer has the right to expect that its employees will attend work when they are scheduled and that they will be on time").

The record evidence suggests that Claimant's December 31, 2015 mid-shift text was prompted by Claimant's family's New Year's Eve tradition and not because of any racism incident. Although Claimant had intended to ask Brodeur earlier in the week, Claimant nevertheless waited until the middle of a large, elaborate catered event to notify Brodeur that he was leaving at 10:00 p.m. Moreover, notwithstanding Claimant's contention that his presence for the December 31, 2015 wedding was not required, he was clearly aware that his actions would be a problem for Employer, since he found it necessary to apologize for the inconvenience and directed that Brodeur could discuss it with him outside if necessary. Notably, our research revealed no case law that supplies a good cause defense or renders *de minimis* an employee's failure to work his entire shift as scheduled because, in the employee's opinion, his attendance was not necessary. Finally, both Brodeur and Claimant stated that Brodeur relented in order to avoid a confrontation,[8] and that Claimant was warned to give more notice next time. Yet, the next day, even though Claimant knew a wedding was scheduled, Claimant gave Employer less than 30 minutes notice that he would be late due simply to his need to attend an "important" meeting he "just realized" he had to attend. N.T. Emp. Ex. 1.

Viewing the evidence in the light most favorable to Employer, as we must, we hold that substantial evidence supports the UCBR's holding that Claimant's behavior on December 31, 2015 and January 1, 2016 represented a willful disregard

---

[8] According to the record and, as Claimant described in his brief, Claimant "was somewhat upset" and "was at times somewhat ag[g]ressive at [the] hear[ing]." Claimant Br. at 31-32; *see also* N.T. at 20-22, 29, 39. Claimant's willingness to become aggressive with the Referee during the hearing lends support to Employer's assessment that Claimant would be confrontational if told he could not leave work early.

11

of Employer's interests without evidence of good cause and, thus, Claimant is not eligible for UC benefits under Section 402(e) of the Law.

Claimant also contends that the Referee erred by disallowing the additional evidence he offered at the hearing, namely, his discrimination claims against Employer for his discharge in retaliation for reporting the racism, and his statements that Employer's refusal to give him a good reference has hindered his ability to obtain other employment. We disagree.

Because substantial evidence supports the UCBR's findings and conclusions, they are conclusive on appeal and, thus, we need not address the Claimant's additional evidence. *Ductmate Indus., Inc.* However, even if we were to examine that issue, this Court has held:

> Under Section 505 of the Administrative Agency Law, 2 Pa.C.S. § 505, administrative agencies are not bound by the technical rules of evidence, and all relevant evidence of reasonably probative value may be received. **Where the record reveals the evidence sought to be introduced is not reasonably probative, the evidence may be excluded**. The liberal rules of evidence relating to administrative agencies afford agencies broad discretion in admitting or excluding evidence, so the exclusion alone may not constitute a procedural defect.

*D.Z. v. Bethlehem Area Sch. Dist.*, 2 A.3d 742, 751 (Pa. Cmwlth. 2010) (citation omitted; emphasis added). Since the evidence Claimant sought to include in the record did not relate specifically to whether Claimant's behavior on December 31, 2015 and January 1, 2016 constituted willful misconduct, or if there was good cause for Claimant's actions, it is irrelevant, and the Referee and, by extension, the UCBR, properly disregarded it.[9]

---

[9] Section 3 of the Law states that its purpose is not to punish or to award damages for an employer's unlawful discrimination or unfair treatment, but rather to provide economic security to persons who become "unemployed through no fault of their own." 43 P.S. § 752.

For all of the above reasons, the UCBR's order is affirmed.

Troy McNeil,                              :
                    Petitioner            :
                                          :
          v.                              :
                                          :
Unemployment Compensation                 :
Board of Review,                          :    No. 955 C.D. 2016
                    Respondent            :

PER CURIAM

O R D E R

AND NOW, this 1st day of May, 2017, the Unemployment Compensation Board of Review's April 15, 2016 order is affirmed.

Troy McNeil,                           :
                    Petitioner         :
                                       :
            v.                         :
                                       :
Unemployment Compensation              :
Board of Review,                       :   No. 955 C.D. 2016
                    Respondent         :   Submitted: January 20, 2017


OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE COSGROVE                      FILED:  May 1, 2017


The majority makes short shrift of Troy McNeil's (Claimant) allegations that he had been subject to racial insult in the course of his work with Anthony's Catering South, Inc. (Employer).  These allegations are beyond troubling and deserve much greater scrutiny not only below but at our level as well.  For this reason alone, I cannot join this decision.  But I would reverse even if there were no racially charged element to this matter.  Whether Claimant's actions amounted to willful misconduct is a question of law which is ours solely to decide. *Scott v. Unemployment Compensation Board of Review*, 105 A.3d 839, 844 n.4 (Pa. Cmwlth. 2014).

Two incidents form the basis for Claimant's discharge:  his leaving an event on December 31, and his reporting late (after advising Employer of a serious family matter) the next day.  Regarding the former, Employer did not object.[1]

---

[1] Employer's reasons for failing to object are irrelevant.  Claimant is accused of willful misconduct which, at the very least, would require some indication from Employer (rather than passive acceptance) that his conduct on December 31 was not acceptable and was, in fact, wrong.

(Referee's Decision/Order at 2.) Accordingly, it cannot be said that, as a matter of law, Claimant's actions that evening constitute willful misconduct.

As for the events of the following day, the family circumstances surrounding Claimant's tardiness are sufficiently "justifiable" and "reasonable" to establish "good cause." *Eshbach v. Unemployment Compensation Board of Review*, 855 A.2d 943, 948 (Pa. Cmwlth. 2004)("Where the action of the employee is justifiable or reasonable under the circumstances, it cannot be considered willful misconduct because it cannot properly be charged as a willful disregard of the employer's intent or rules or of the standard of conduct which the employer has a right to expect.") There is no evidence that Claimant failed to do his job when he did arrive, nor that his absence in any way hampered the success of this (or the previous evening's) event. Further, with no specific policy governing attendance, it is difficult to discern how completion of one's duties under these circumstances constitutes "misconduct."

This is a troubling case, one which likely could have and should have been resolved more amicably between the parties themselves. Instead, it has found its way into the administrative and now judicial arena, with an unhappy (and unnecessary) result, further poisoned by allegations of racial insult. I am compelled to dissent.

_____
JOSEPH M. COSGROVE, Judge

JMC-2