IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Vital Support Home Health          :
Care Agency, Inc.,                 :
                    Petitioner     :
                                   :
            v.                     :
                                   :
Unemployment Compensation          :
Board of Review,                   :   No. 1598 C.D. 2016
                    Respondent     :   Submitted: March 17, 2017


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE JOSEPH M. COSGROVE, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                        FILED:  October 20, 2017


            Vital Support Home Health Care Agency, Inc. (Employer) petitions this
Court for review of the Unemployment Compensation (UC) Board of Review's
(UCBR) August 30, 2016 order affirming the Referee's decision granting Unique S.
Brown (Claimant) UC benefits.  Essentially, the issue before the Court is whether the
UCBR erred by finding Claimant eligible for UC benefits.[1]  After review, we
reverse.[2]

---

[1] Employer's Statement of Questions Involved listed three questions: (1) whether Employer
established that Claimant was discharged for willful misconduct; (2) whether Claimant failed to
establish good cause for her willful misconduct; and, (3) whether the Referee found Claimant's
testimony more credible than the testimony offered by Employer's witness.  *See* Employer Br. at 5.
Because the second and third issues are subsumed in the analysis of the first, we have combined the
issues herein.

[2] Currently, there is a vacancy among the commissioned judges of this Court.  While the
panel of judges that heard the case voted 2 to 1 to affirm, pursuant to our opinion circulation rules
all commissioned judges voted on the opinion and a tie vote resulted.  Therefore, this opinion is
filed pursuant to Section 256(b) of the Internal Operating Procedures of the Commonwealth Court,
210 Pa. Code § 67.256(b).

Claimant was employed as a home health aide by Employer beginning in May 2014. On May 13, 2014, Claimant executed an Employment Agreement for At Will Employee (Agreement) which stated, *inter alia*:

> 1.2 <u>Acceptance of Employment</u>. [**Claimant**] **accepts employment** with [Employer] upon the terms set forth above **and agrees** to devote all [Claimant's] time, energy and ability to the interests of [Employer], and **to perform** [**her**] **duties in an** efficient, **trustworthy and business-like manner**.
>
> 1.3 <u>Devotion of Time to Employment</u>. [Claimant] shall devote [her] best efforts and substantially all of [her] working time to performing the duties on behalf of [Employer]. [**Claimant**] **shall provide services during the hours that are scheduled by** [**Employer's**] **management.** [**Claimant**] **shall be prompt in reporting to work at the assigned time**.

Reproduced Record (R.R.) at 71a (emphasis added); *see also* R.R. at 44a, 79a. In the Agreement, Article VII, Claimant further agreed to comply with Employer's Employee Conduct Policy, which provided, in relevant part:

> Payroll and Patient Care Documentation
>
> 1. All home health aides work time is verified through the employee submitted 'time sheets' and 'visit notes.'
>
> - **It is the employee's responsibility to notify the office if a problem occurred where a mistake on the time sheet or visit notes was made by the employee.**
>
> - **All employee signatures, patient signatures, in and out times and dates must accurately reflect the times worked/services rendered**.
>
> - [**Employer**] **reserves the right to conduct an investigation of employees times worked, should a concern and/or complaint arise, by either a patient, family member or through a third**[-]**party report**.

***<u>ANY FALSIFICATION OF INFORMATION BY AN EMPLOYEE WILL RESULT IN IMMEDIATE EMPLOYMENT TERMINATION</u>***.[3]

R.R. at 80a (bold emphasis added); *see also* R.R. at 45a, 80a-82a. In addition, Claimant executed Employer's revised Employee Conduct Policy Addendum, in which she agreed to "notify [Employer] immediately when [her] client gets hospitalized," "not to take care of [a] client while he/she is hospitalized," and her "[f]ailure to advise and report to work as assigned will be considered job abandonment and subject to immediate dismissal." R.R. at 81a; *see also* R.R. at 45a.

Claimant's father had a medical benefit allowing Claimant to be paid to provide him home health services, which she performed weekdays from 9:00 a.m. to 3:00 p.m. Claimant usually had her father sign her Home Health Aide Weekly Visit Note form certifying her work hours in advance of providing services for him.[4] According to the certification at the bottom of her time sheets, Claimant agreed by signing her name that "[s]ervices cannot be provided when consumer is hospitalized . . . ," and that she "must at all times follow the [Agreement], employee policy handbook, employment conduct policy manual to which [she was a] signatory." R.R. at 84a-85a; *see also* R.R. at 48a-49a. Claimant's father was admitted to the hospital from October 31 to November 3, 2015. The time sheets Claimant submitted to Employer for the weeks ending November 1 and 8, 2015 listed her usual work hours

---

[3] Employer's policy stated that "[**f**]**alsification** of documents regarding patient care,. . . **or inaccurate documentation** of patient care . . . or other acts of deception raise serious concerns; thus will result in immediate employment terminations." R.R. at 80a (emphasis added).

[4] Employer's aides complete Home Health Aide Weekly Visit Note forms for each client, which contain their hours worked and the client's signature. Claimant transferred those hours from the weekly visit note forms to her time sheets and submitted them to Employer. *See* R.R. at 47a, 84a-85a, 88a.

By signing the Home Health Aide Weekly Visit Note form, the patient certifies: "[I] hereby agree and acknowledge **receipt of rendered services**." R.R. at 88a (emphasis added). By signing the forms, the aide certifies: "I hereby state that the time sheet reflects **accurate representation of the hours worked**." R.R. at 88a (emphasis added).

3

with her father.  Claimant did not correct her pre-written entries to reflect that she did not care for her father so she would not be paid for November 1, 2 or 3 and, thus, Employer paid her for those days.

Claimant was assigned to a new client (New Client) in February 2016. Claimant was scheduled to work for New Client from 12:00 p.m. until 4:00 p.m. on April 14, 2016.  Claimant notified New Client's contact (New Client's sister) that she would be late, but did not report her tardiness to Employer's office.  At 1:51 p.m., Employer's office manager, Vitaliya Gerasimenko (Gerasimenko), called Claimant, who stated that she was on her way to New Client's house.  Gerasimenko told Claimant it was unacceptable for her to be late and that she should have notified the office.  Gerasimenko also questioned Claimant about her November timesheet entries.  Claimant replied that she had left messages at the office about her father's hospitalization.  After discussing the November time sheets, the call was disconnected.  Gerasimenko called her again, but Claimant refused to talk with her because she was working with New Client.  Gerasimenko instructed Claimant to put New Client on the phone to prove it, but Claimant cursed at Gerasimenko and hung up on her.  On April 14, 2016, Employer mailed Claimant a letter stating that it served as notification and confirmation of Claimant's employment termination pursuant to their conversation.

Claimant applied for UC benefits.  On May 25, 2016, the Erie UC Service Center determined that Claimant was ineligible for benefits under Section 402(e) of the UC Law (Law).[5]  Claimant appealed, and a Referee hearing was held. On July 11, 2016, the Referee reversed the UC Service Center's determination, and granted Claimant UC benefits.  Employer appealed to the UCBR.  On August 30,

---

[5] Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e) (referring to willful misconduct).

4

2016, the UCBR adopted the Referee's findings and conclusions, and affirmed the Referee's decision. Employer appealed to this Court.[6]

Employer argues that the UCBR erred by finding Claimant eligible for UC benefits where Employer established that Claimant was discharged for work rule violations that amounted to willful misconduct. Initially,

> Section 402(e) of the Law provides that an employee is ineligible for [UC] benefits when [her] unemployment is due to discharge from work for willful misconduct connected to [her] work. The employer bears the burden of proving willful misconduct in an unemployment compensation case. Willful misconduct has been defined as (1) an act of wanton or willful disregard of the employer's interest; (2) a deliberate violation of the employer's rules; (3) a disregard of standards of behavior which the employer has a right to expect of an employee; or (4) negligence indicating an intentional disregard of the employer's interest or a disregard of the employee's duties and obligations to the employer.

*Dep't of Transp. v. Unemployment Comp. Bd. of Review*, 755 A.2d 744, 747 n.4 (Pa. Cmwlth. 2000) (citation omitted). "If the employer satisfies its burden, the burden shifts to the employee to show that [s]he . . . had good cause for h[er] . . . conduct. 'A claimant has good cause if h[er] . . . actions are justifiable and reasonable under the circumstances.'" *Grand Sport Auto Body v. Unemployment Comp. Bd. of Review*, 55 A.3d 186, 190 (Pa. Cmwlth. 2012) (citation omitted; quoting *Docherty v. Unemployment Comp. Bd. of Review*, 898 A.2d 1205, 1208-09 (Pa. Cmwlth. 2006)). Ultimately, "[t]he question of whether conduct rises to the level of willful misconduct

---

[6] Where, such as here, the party with the burden of proof does not prevail before the [UCBR], our scope of review is limited to determining **whether or not findings of fact are consistent** with each other and **with the conclusions of law** and whether they can be sustained without a capricious disregard of competent evidence.

*Kuna v. Unemployment Comp. Bd. of Review*, 512 A.2d 772, 775 (Pa. Cmwlth. 1986) (emphasis added).

5

is a question of law to be determined by this Court." *Scott v. Unemployment Comp. Bd. of Review*, 105 A.3d 839, 844 (Pa. Cmwlth. 2014).

The law is well established that:

> [T]he [UCBR] is the ultimate fact-finder in [UC] matters and is empowered to resolve all conflicts in evidence, witness credibility, and weight accorded the evidence. It is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is whether there is evidence to support the findings actually made. Where substantial evidence supports the [UCBR's] findings, they are conclusive on appeal.[7]

*Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Review*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008) (citations omitted).

At the Referee hearing, Gerasimenko testified that, on April 14, 2016, New Client complained to Employer's office that Claimant was "coming in late and leaving early[.]" R.R. at 49a. Gerasimenko described that she immediately contacted Claimant to discuss the complaint and the issue of Claimant's time sheets during her father's hospitalization. She reported that Claimant was scheduled to work for New Client from 12:00 p.m. to 4:00 p.m. that day, but when she contacted Claimant at 1:51 p.m., Claimant reported that she was running a little bit late, and she was on her way to New Client's house. Gerasimenko described:

---

[7] This Court has explained:

> Substantial evidence is relevant evidence upon which a reasonable mind could base a conclusion. In deciding whether there is substantial evidence to support the [UCBR's] findings, this Court must examine the testimony in the light most favorable to the prevailing party, giving that party the benefit of any inferences which can logically and reasonably be drawn from the evidence.

*Sanders v. Unemployment Comp. Bd. of Review*, 739 A.2d 616, 618 (Pa. Cmwlth. 1999).

And I told her that it was unacceptable because **being late almost two hours is not considered to be a little bit late** and she never called the office to notify us that she was going to be running late also. She -- her response to me was okay, I'm just running a little late and **she hung up on me** the first time. And then I called her back. She picked it up again and she said okay, well, I am with [New C]lient right now and I can't really talk to you. I said okay, put [New C]lient on the phone, because I want to verify that you are with [New C]lient right now. And she -- this is when she started cursing me out. **She said what the f . . . are you doing on my phone and FU and you are an f-ing B. I said okay, do you know that this is completely unacceptable that you cannot do that** and you cannot prove to me that you are with [New C]lient right now. Do you understand that? And she just hung up on me. I was trying to call her back and I even told the office staff to try to get a hold of her. I never did. I mailed out a letter. Also there was -- in between that, that conversation that we had with her, I also questioned her about the days that she submitted to us for her [f]ather, when she was working for [her f]ather. I said well, I obtained the record. **I got the record just recently, stating that you were also submitting for the time when** [**he was hospitalized.**]

R.R. at 50a (emphasis added). According to Claimant's Weekly Visit Notes for New Client, Claimant worked from 1:40 p.m. to 3:00 p.m. on April 14, 2016. *See* R.R. at 88a. Gerasimenko added:

When [Claimant] submitted the residential notes to the office, I called [New Client] and I asked her about the April 14th date and she said that [Claimant] only showed up for a few minutes and gave her the paper to sign that day and it was around -- she couldn't tell me the exact time, but she said -- she said it was sometime in the morning and then [Claimant] left, so [Claimant] didn't do any work that day. . . .

R.R. at 51a. By April 14, 2016 letter, Employer notified Claimant that she was discharged for violating Employer's policies and procedures, falsifying time sheets,

yelling, using foul, offensive language and having a poor attitude toward Employer.[8]
*See* R.R. at 89a.

Moreover, Claimant acknowledged that she signed the Agreement and Employer's conduct policies. Claimant also admitted that Gerasimenko called her on April 14, 2015 after 1:00 p.m., that she stated that she was not yet at New Client's house and that Gerasimenko told her it was unacceptable to be so late for work. Claimant also conceded that she cursed at Gerasimenko, hung up the phone on her and was yelling inside New Client's house. Claimant maintained that it was standard practice for aides to contact the affected client rather than the office when they will be late. She articulated:

---

[8] Gerasimenko issued the letter, which specifically stated:

> As per our conversation with you today, where I explained [the] reasons for your termination [-] you were yelling, using foul, offensive language[,] such as saying 'What the f…ck, F…ck It, What the f…ck are you doing on my phone, F…ck you!' which is unacceptable. Also, when you were called today at 1:51 p.m.[,] you were not at work, although you were scheduled to be there from 12:00 to 4:00 p[.]m.
>
> Your position with the agency has been terminated due to direct violation of the Employee Conduct Policy which you are aware of.
>
> We regret to inform you of our decision that has resulted due to your conduct based on the following:
>
> - Failure to contact your supervisor and inform of your work status
>
> - Failure to follow procedures and [Employer] policies
>
> - Falsifying time worked on several occasions, such as submitting paperwork for the time you didn't work
>
> - Poor attitude toward [E]mployer
>
> Your employment is hereby terminated as a result of your actions.

R.R. at 89a.

8

> I said I talked to [New Client's sister] already. I explained to [Gerasimenko] my situation, they work with me because I said I was pregnant. And I had to make sure somebody was watching my son. . . . I did not hang up in [Gerasimenko's] ear. My phone hung up. She called me back, I picked right back up. I'm walking down Franklin Terminal now, walking up to [New C]lient's house. She said well, I'm -- the reason why I'm calling you is because we got some previous – received previous papers [about your father]. . . . So like I explained to her, when my [f]ather was hospitalized and like they say on the paper, you're supposed to call 24 hours ahead or to call and leave a message and nobody -- they said they'd have somebody call you right back. That's a lie. Nobody never calls back. I don't care how many times you call, it can be the weekend, it can be during the week day [sic]. They do not return your calls at all. . . . I talked . . . to somebody that was working there. . . . I said **I left you all two messages**. That's it. I wasn't going to keep doing you all [sic], leaving messages on your phone. And I wasn't, I didn't do it. So she said well, I don't know what dates you're talking about, but the dates that I'm talking about are right here. I have the proof of document [sic]. Today will be your last day of working. So yes, I got mad. For one, it's hot, I'm already running late for work, I'm irritable and you're telling me today is my last day of work for something that happened in 2015. How do you expect for somebody to sit up there and be calm about it? No, I was not calm. . . . I'm not going to lie. **I was wrong for cussing at her**. But in the same token, for you to tell me that you're going to let me go for any reason that you want to, no matter if it's an old statement or not.

R.R. at 55a-56a (emphasis added). Claimant further expounded:

> Now . . . , this time **I did hang up**, because I'm going inside somebody's house now. Then you call me right back. I'm upstairs with [New Client]. I can -- if they was here, they would tell you. I done seen [sic] [New Client and her sisters] and everybody that was living there. You're telling me that I'm not at work. You never asked can you speak to [New C]lient.

R.R. at 57a (emphasis added).

9

> Now [Gerasimenko] called back again, because like I said, **I did hang up on her**. I said I'm in [New C]lient's house right now, I'm running late. I'm trying to do everything I got to do before I have to go pick my child up. She is like this is unacceptable. She said like, she said you're using profanity. I have not cussed at you. She was like I wish you the best of luck in life and she said something else and I said [Gerasimenko] I got to go, because I'm yelling inside of a client's house and she's right there. . . . So for you to say. . . [New Client] called you, . . . that's another lie. [New Client] can barely talk on the phone. So you have to talk to her sister, which is her caretaker, well, who she lives with. That's how you have to talk to her. And yeah, she wants to tell you yeah, I was late. . . . Yes, I was running late, that's not a lie. That's the truth.

R.R. at 57a (emphasis added).

Relative to Claimant's November 2015 patient care records, Employer's Employee Conduct Policy specifically required that "[a]ll employee signatures, patient signatures, in and out times and dates must accurately reflect the times worked/services rendered." R.R. at 80a. Notwithstanding, Claimant admitted ~~that~~ she regularly had her father sign her weekly visit note form in advance of providing him care. She explained that her father cannot write every day, so on the days he is able to sign his name, she has him sign the form for the entire week "as best as he can, . . . and [] make copies of that." R.R. at 58a. Claimant described:

> I don't fill out the dates or nothing until the end of the week and I make copies of it, before my signature is on there . . . . So I fill them out and then I fax it over. So like I said, I was wrong. Don't get me wrong, like I told her on the phone, I was wrong for that. But you're not going to sit up there and come to me a year later.

R.R. at 58a; *see also* R.R. at 59a (wherein Claimant testified "if he was in the hospital, I was wrong for submitting [that time]").

The UCBR adopted the Referee's findings that:

10

8.  [Employer] had a policy, which it listed at the bottom of its 'weekly time schedule' forms, that '[s]ervices cannot be provided when [a client] is hospitalized . . . .'

9. [Claimant's] father was admitted to the hospital [on] the evening of October 31, and discharged [on] the evening of November 3, 2015.

10. [**Claimant**] **submitted two 'weekly time schedule sheets' for the weeks ending November 1 and 8, 2015 on which she listed her usual work hours with her father, <u>and</u> failed to correct her pre-written entries so that she would not be paid for November 1, 2, or 3**; [**Employer**] **did pay her for those days**.

11. On April 14, 2016, the following events occurred:

   a. [Claimant] was scheduled to work at 12:00 Noon; and

   b. The babysitter for [Claimant's] five year old son had not arrived in time for her to go to [New Client's] home; and

   c. [Claimant] called [New Client's] contact (New Client's sister) and told her she would be late; and

   d. [Claimant] did not tell [Employer] she was going to be late; and

   e. [Gerasimenko] called [Claimant] about 1:50 p.m., [Claimant] said she was traveling to [New Client's] house, [Gerasimenko] told her it was 'unacceptable' that she was late and that she did not notify the office, and then questioned [Claimant] about her November time entries, to which [Claimant] replied 'I left you messages about my father being in the hospital'; and

   f. After discussing the November time sheets, [Gerasimenko] told [Claimant], among other things that, 'Today will be your last day', to which [Claimant] replied by cursing at [Gerasimenko] and then disconnecting the call; and

   g. After [Claimant] arrived at [New Client's] house and was providing services, [Gerasimenko] called

11

> her again, [Claimant] replied that she could not discuss anything because she was working with [New Client], [Gerasimenko] said to put [New Client] on the phone to prove it, and [Claimant] again disconnected the call.

Referee Dec. at 2 (emphasis added). In finding Claimant eligible for UC benefits, the UCBR adopted the Referee's reasoning:

> [**Employer**] **cited several reasons for termination**, the first being [**Claimant's**] **profane outburst**. There is a conflict in the parties' testimony, however, as to whether that came before or after [Gerasimenko] said 'today will be your last day[.]' [Claimant] was more credible on this point;[9] thus, the record shows the reason for her termination was not her outburst but rather either the November time sheets, [Gerasimenko's] discovery that she was late getting to [New Client's] house on April 14, or a combination thereof.
>
> Regarding the November incident, [Employer] was unclear as to why it was not discovered until April; even if there was good cause for that, however, [Claimant] explained how it occurred and testified that she had left messages [with Employer] about the dates her father was hospitalized. While [**Claimant**] **was negligent in submitting her time sheets**, the record is insufficient to show she committed fraud by claiming pay for those days.
>
> Regarding the April 14 lateness, [Claimant] showed good cause for it. Although she did not inform [Employer], she did inform [New Client] and testified it was standard practice; [Employer] did not show a rule stating she had to notify someone other than the client on days she was going to be late or vary her hours. While [**Employer**] **has the right to terminate** [**Claimant's employment**] **based on** [**New Client's**] **complaints**, it did not show [Claimant] was late on specific days other than April 14. On this record, therefore, [Claimant's] separation may not be considered disqualifying under Section 402(e) [of the Law].

Referee Dec. at 2-3 (emphasis added).

---

[9] This was the Referee's only credibility determination.

12

However, **the record evidence is undisputed that Employer had written policies that required Claimant to be prompt when reporting to work, to act in a business-like manner, and not to submit false or innacurate time sheets**. Claimant was well aware of those policies and expressly agreed to them.

Nevertheless, **Claimant admitted she knowingly submitted inaccurate time sheets and was paid for days in October and November 2015 during which her father was hospitalized**. Her only defenses to the charge were that she left messages with Employer that her father was hospitalized, and that Employer should not be permitted to penalize her for past behavior. According to Gerasimenko's undisputed testimony, she "just recently" obtained documentation that Claimant submitted time sheets in the fall for days during which Claimant's father had been hospitalized. R.R. at 50a. Notwithstanding, when or if Claimant timely informed Employer that her father was hospitalized, and when Employer may have become aware of that violation does not change the fact that Claimant knowingly and admittedly submitted two false and/or inaccurate time sheets and was paid for hours she did not work.

Claimant prepared, signed and submitted the time sheets. She was responsible to ensure their accuracy. Claimant admitted that she was wrong for consciously and deliberately directing her father to certify her work hours on her weekly visit note forms in advance of her rendering services for him during those weeks, and thereafter transferring that false/inaccurate information to two time sheets and submitting them to Employer. Employer's Employee Conduct Policy specifies: "It is the employee's responsibility to notify the office if a problem occurred where a mistake on the time sheet or visit notes was made by the employee." R.R. at 80a. The policy further states: "It is [the employee's] responsibility to ensure the paperwork [he or she] submit[s] is filled out correctly." R.R. at 81a.

13

Although Claimant pronounced that she "left [Employer] two messages" about her father's hospitalization, R.R. at 56a, there is no record evidence about when those messages may have been left, or whether she specifically informed Employer that two time sheets she submitted were inaccurate as a result. In fact, Claimant acknowledged that she left two messages, but refused "to keep . . . leaving messages on [Employer's] phone." R.R. at 56a. Under such circumstances, we disagree with the Referee and the UCBR that "while [Claimant] was negligent in submitting her time sheets," she did not commit disqualifying willful misconduct. Referee Dec. at 3.

> We have explained that 'an employer cannot demonstrate willful misconduct by merely showing that an employee committed a negligent act, but instead must present evidence indicating that the conduct was of an intentional and deliberate nature.' *Myers* [*v. Unemployment Comp. Bd. of Review,*] 625 A.2d [622,] 625 [(Pa. 1993)]. (internal citation omitted). Furthermore, this Court has acknowledged that a determination of whether an action constitutes willful misconduct requires a consideration of 'all of the circumstances, including the reasons for the employee's noncompliance with the employer's directives.' *Rebel v. Unemployment Comp*[.] *B*[*d.*] *of Review, . . .* 723 A.2d 156, 158 ([Pa.] 1998).

*Grieb v. Unemployment Comp. Bd. of Review*, 827 A.2d 422, 426 (Pa. 2003).

Pennsylvania Courts have long held:

> a knowing falsehood or misrepresentation to the employer concerning the employee's work constitutes a willful disregard of the employer's interest and a departure from the standards of behavior an employer can rightfully expect of an employee, and therefore is willful misconduct under the statute.

*Smith v. Unemployment Comp. Bd. of Review, . . .* 411 A.2d 280, 281 ([Pa.] Cmwlth.] 1980) (citing, *inter alia, Miokovic v. Unemployment Comp. Bd. of Review, . . .* 171 A.2d 799 ([Pa. Super.] 1961)).

14

*Melomed v. Unemployment Comp. Bd. of Review*, 972 A.2d 593, 595 (Pa. Cmwlth. 2009).

This Court's review of the record reveals that Claimant knowingly submitted false and/or inaccurate time sheets and she did not notify Employer of the inaccuracies,[10] in violation of Employer's policies.[11] Moreover, Employer's prohibition against falsification[12] and/or inaccurate patient care records does not require that violations be intentional and fraudulent,[13] *see* R.R. at 80a, nor do Employer's conduct policies restrict when Employer may terminate Claimant's employment for violations thereof.[14] In fact, Claimant agreed with Employer's "right to conduct an investigation of employee times worked, should a concern . . . arise[.]" R.R. at 80a.

Accordingly, we hold that although the UCBR's findings 8, 9 and 10 are supported by substantial record evidence, those findings do not support the UCBR's conclusion that Claimant is entitled to UC benefits because her conduct relative to her November 2015 time sheets was merely negligent. Willful misconduct includes "deliberate violation of [Employer's] work rules" and "negligence indicating an intentional disregard of [Employer's] interest or a disregard of [Claimant's] duties

---

[10] Even if we were to assume, as the Dissent proffers, that the two messages Claimant left Employer regarding her father's hospitalizations could have included explanations that her timesheets were inaccurate as a result, then Employer would not have paid her for those days. The UCBR found to the contrary.

[11] Notably, Claimant timesheet for her work with New Client on April 14, 2016, reflects that Claimant arrived at New Client's home at 1:40 p.m. *See* R.R. at 88a. However, according to the testimony, Claimant had not yet arrived at New Client's home when Gerasimenko contacted her at 1:51 p.m. *See* Referee Dec. at 2.

[12] To "falsify" is "[t]o make something false; . . . [t]o prove something to be false or erroneous . . . ." Black's Law Dictionary 678 (9th ed. 2009).

[13] A "fraudulant act" is defined as "[c]onduct involving bad faith, dishonesty, a lack of integrity, or moral turpitude." Black's Law Dictionary 733.

[14] Claimant acknowledged her understanding of Employer's policy regarding falsification of documents, which clearly defined falsification to include "incomplete or inaccurate documentation." R.R. at 80a.

15

and obligations to [Employer]." *Dep't of Transp.*, 755 A.2d at 747 n.4. Based on the findings the UCBR made and which are conclusive on appeal, Claimant's falsification and/or inaccuracies in her time sheets, and her subsequent failure to correct them violated Employer's specific policies and demonstrated an intentional disregard of Employer's interests and Claimant's obligations and, thus, constituted willful misconduct.

**Claimant also clearly admitted that she was late to work on April 14, 2016, thereby violating Employer's policy, used profanity, yelled at Employer while inside New Client's house, and hung up the phone on Employer when Employer attempted to discuss these matters with her**. The UCBR's adopted conclusion that Claimant's discharge was due to Claimant's false November time sheets and being late on April 14, 2016, rather than her unbusiness-like treatment of Gerasimenko, does not alter that Employer's documented reasons for Claimant's employment separation were for violating Employer's policies and procedures, falsifying time sheets and having a poor attitude toward Employer. *See* R.R. at 89a.

Moreover, precisely when during the April 14, 2016 exchanges Gerasimenko told Claimant that day would be her last day of employment makes no difference when, by Claimant's own admission and based upon her time sheet, and the Board's adopted finding, Claimant continued to provide services for New Client after her profane outburst occurred.[15] *See* R.R. at 56a, 88a. Under the circumstances,

_____

[15] According to the record, Employer "considered [April 14, 2016] [Claimant's] last day of work[.]" R.R. at 51a; *see also* R.R. at 52a-53a (where the Referee corrected Gerasimenko's misstatement that she considered April 13, 2016 Claimant's last day). Claimant confirmed that Employer told her: "Today will be your last day of working." R.R. at 56a. Moreover, Claimant continued on to New Client's home where she yelled at Employer in New Client's presence and then, according to Claimant's weekly visit note, still provided New Client care for approximately one hour and twenty minutes (from 1:40 to 3:00 p.m.). *See* R.R. at 88a. The Board specifically found: "After [Claimant] arrived at [New Client's] house and **was providing services**, [Gerasimenko] called her again, [and Claimant] replied that she could not discuss anything **because she was working with [New Client.**]" Referee Dec. at 2 (Finding of Fact 11.g) (emphasis added).

Claimant was still an employee when she treated Gerasimenko in that manner. The law is well settled that "[a]n employee's use of abusive, vulgar or offensive language with a superior is a form of insubordination that can constitute willful misconduct, even if the employer has not adopted a specific work rule prohibiting such language." *Brown v. Unemployment Comp. Bd. of Review*, 49 A.3d 933, 937 (Pa. Cmwlth. 2012). This Court has held that such behavior, particularly in the presence of an employer's clients or customers, "evidences a disregard of standards that an employer can rightfully expect of its employees."[16] *Leone v. Unemployment Comp. Bd. of Review*, 885 A.2d 76, 81 (Pa. Cmwlth. 2005). Accordingly, we hold that there was substantial evidence of Claimant's willful misconduct in violating Employer's policies and in her treatment of Gerasimenko on April 14, 2016, and the UCBR erred by concluding otherwise.

In addition, the UCBR's finding notwithstanding, **there was no record evidence of the reason for Claimant's tardiness on April 14, 2016 that would demonstrate good cause**. Despite that Employer's policy did not specifically address tardiness, Claimant was on notice that her "[f]ailure to advise and report to work as assigned will be considered job abandonment and subject to immediate dismissal." R.R. at 81a. Claimant knew that her failure to report to work as assigned and/or failed to provide services during her scheduled hours violated Employer's express policy and would subject her to immediate discharge. *See* R.R. at 65a. Rather than offering good cause for her April 14, 2016 tardiness, Claimant declared

---

Thus, neither party considered Claimant's employment terminated as of the moment the confrontation occurred. So, notwithstanding Claimant's assertion that she did not swear at Employer until after her discharge, Claimant was still employed at least until she left New Client's home at 3:00 p.m.

[16] Claimant testified: "I'm yelling inside of [New C]lient's house and she's right there." R.R. at 58a.

that she was only "a little late."[17]  R.R. at 55a.  Further, the record does not reflect, as the Referee and the UCBR claimed, that "[t]he babysitter for [Claimant's] five[-]year[-]old son had not arrived in time for her to go to [New Client's] home[.]" Referee Dec. at 2.  Rather, Claimant stated only: "[New Client and her sister] work with me because I said I was pregnant.  And I had to make sure somebody was watching my son."  R.R. at 55a.  These statements alone do not establish that Claimant's "actions are justifiable and reasonable under the circumstances."  *Grand Sport Auto Body*, 55 A.3d at 190.

Finally, this Court has held that "[a] work rule violation need not be shown where the behavior standard is obvious, and the employee's conduct is so inimical to the employer's best interests that discharge is a natural result."  *Tongel v. Unemployment Comp. Bd. of Review*, 501 A.2d 716, 717 (Pa. Cmwlth. 1985); *see also Evans v. Unemployment Comp. Bd. of Review* (Pa. Cmwlth. No. 2419 C.D. 2014, filed December 2, 2015).[18]  Certainly, "[a]n employer has the right to expect that his employees will attend work when they are scheduled, that they will be on time and that they will not leave work early without permission."  *Fritz v. Unemployment Comp. Bd. of Review*, 446 A.2d 330, 333 (Pa. Cmwlth. 1982); *see also Ellis v. Unemployment Comp. Bd. of Review*, 59 A.3d 1159, 1163 (Pa. Cmwlth. 2013) ("It is well-settled that an employer has the right to expect that its employees will attend work when they are scheduled and that they will be on time[.]").  Here, Claimant's submission of and failure to correct her November 2015 time sheet, together with her failure to timely report to work on April 14, 2016, and her profane outburst related thereto, were not "justifiable and reasonable under the circumstances[,]" *Grand Sport*

---

[17] This Court is hard-pressed to agree that Claimant being nearly two hours late for a four-hour shift is just a little late.

[18] This Court's unreported memorandum opinions may be cited "for [their] persuasive value, but not as a binding precedent."  Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

*Auto Body*, 55 A.3d at 190, nor were they of the type of conduct Employer had a right to expect. *See Leone*; *see also Fritz*.

Because Employer met its burden of proving that Claimant violated its policies, and Claimant did not meet her burden of proving that she had good cause for doing so, we hold that the UCBR erred by finding Claimant eligible for UC benefits. Based on the foregoing, we reverse the UCBR's order.

_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Vital Support Home Health      :
Care Agency, Inc.,           :
            Petitioner   :
                     :
         v.       :
                     :
Unemployment Compensation  :
Board of Review,          :   No. 1598 C.D. 2016
          Respondent  :

## O R D E R

AND NOW, this 20th day of October, 2017, the Unemployment Compensation Board of Review's August 30, 2016 order is reversed.

_____
ANNE E. COVEY, Judge

Vital Support Home Health    :
Care Agency, Inc.,            :
          Petitioner     :
                                :
         v.                 :
                                :
Unemployment Compensation  :
Board of Review,          :   No. 1598 C.D. 2016
          Respondent    :   Submitted: March 17, 2017

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE JOSEPH M. COSGROVE, Judge

OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE COSGROVE            FILED: October 20, 2017

        Because I believe the findings of fact made by the Unemployment Compensation Board of Review (Board) are supported by substantial evidence in the record, I cannot agree with the Majority's decision to reverse and, therefore, respectfully dissent.

        The appellate court's duty is to examine the testimony in the light most favorable to the party in whose favor the Board has found, giving that party the benefit of all inferences that can logically and reasonably be drawn from the testimony, to see if substantial evidence for the Board's conclusion exists. *Penflex, Inc. v. Bryson*, 485 A.2d 359, 365 (Pa. 1984). The Board's August 30, 2016 order adopted and incorporated the Referee's findings and conclusions.

With regard to the alleged falsification of paperwork, the Board accepted Unique Brown's (Claimant) testimony that she left messages with Vital Support Home Health Care Agency, Inc. (Employer) about the dates her father was hospitalized. (Referee's Decision/Order at 3; Reproduced Record (R.R.) at 116a.) Claimant's testimony was uncontroverted. Employer's evidence consisted of Claimant's signed time sheets. Claimant admitted it was her signature on the form which indicated she performed services while her father was hospitalized. (R.R. at 59a.) However, Claimant could not recall the circumstances and what happened at the time of his hospitalization. *Id.* While Claimant didn't testify to the dates or exact content of the messages left, her testimony was unequivocal that she called Employer about her father's hospitalization. *Id.* at 56a. Claimant further testified that Employer never returned calls, no matter "how many times you call, it can be the weekend, it can be during the week. They do not return your calls at all." *Id.*

In support of its decision to reverse the Board's order, the Majority cites the lack of record evidence about "when those messages may have been left, or whether she specifically informed Employer that two time sheets she submitted were inaccurate as a result." (Majority, slip op. at 13.) While this is facially accurate, neither does the record contain evidence that Claimant did not, in fact, attempt to notify Employer her father was hospitalized.

The Majority takes issue with the behavior of Claimant when speaking with Vitaliya Gerasimenko (Gerasimenko), the office manager for Employer. Claimant readily admitted that, during a telephone conversation with Gerasimenko which took place on Claimant's final day of employment, she became angry and cursed at Gerasimenko. However, Claimant testified the outburst was precipitated by Gerasimenko's statement that "today would be [her] last day." (R.R. at 56a.)

Contrary to this, it was Gerasimenko's position that Claimant began to curse at her **before** she terminated Claimant's employment. *Id.* at 50a. The Board resolved this conflict in testimony with a finding that Claimant was the more credible witness. That is the Board's job, not ours. The Board, not this Court, is the ultimate factfinder empowered to make credibility determinations. *McCarthy v. Unemployment Compensation Board of Review*, 829 A.2d 1266, 1270 (Pa. Cmwlth. 2003). This Court should not reweigh the evidence and substitute its judgment for that of the factfinder, *Commonwealth v. Williams*, 854 A.2d 440 (Pa. 2004), but that is precisely what we are doing here. As to the Majority's conclusion that Claimant's behavior evidenced a disregard of standards an employer can rightfully expect from its employee and, thus, Claimant committed willful misconduct, (Majority, slip op. at 15), it goes without saying that an employer's expectations of an employee's behavior are no longer relevant once the employment relationship has been terminated.

Finally, the Majority contends Claimant failed to demonstrate good cause for being tardy to work on her last date of employment. Claimant testified she contacted the client, which was standard protocol, and the client was willing to work with her because Claimant was pregnant. (R.R. at 55a.) Given Claimant's uncontroverted testimony that Employer did not return phone calls, it seems logical that Claimant would contact the client and not Employer. As noted in the Referee's decision, Employer provided no policy that required Claimant to notify anyone other than the client that she would be late or needed her hours adjusted. (Referee's Decision at 3; R.R. at 116a.) Employer's Conduct Policy required employees to provide the office with 24-hour notice if unable to work. (Employer Exhibit #2; R.R. at 80a.) Claimant was admittedly late (a fact which was accurately reported on

JMC-3

her time sheet), (Employer's Exhibit #9; R.R. at 88a), but she did not fail to report to work in contravention of the policy.

Simply put, the Majority does not give the successful party the benefit of all inferences that could be logically and reasonably drawn from the testimony, in contravention of our Supreme Court's directive in *Penflex*.  I must, therefore, dissent.


_____
JOSEPH M. COSGROVE, Judge