IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Steven E. Fee,                                    :
                    Petitioner                    :
                                                  :    No. 405 C.D. 2020
              v.                                  :
                                                  :    Submitted: September 11, 2020
Unemployment Compensation                         :
Board of Review,                                  :
                    Respondent                    :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge[1]
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge


## *OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                                    FILED: May 3, 2021


          Steven E. Fee (Claimant) petitions for review, *pro se*, of the April 2, 2020
order of the Unemployment Compensation Board of Review (Board), which affirmed
a referee's decision finding that he was ineligible for unemployment compensation
(UC) benefits pursuant to section 402(e) of the Unemployment Compensation Law
(Law).[2] We vacate and remand.

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Leavitt
completed her term as President Judge.

[2] Section 402(e) of the Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897,
*as amended*, 43 P.S. §802(e). Section 402(e) provides that "an employe shall be ineligible for
compensation for any week . . . [i]n which his unemployment is due to his discharge or temporary
suspension from work for willful misconduct connected with his work, irrespective of whether or not
such work is 'employment' as defined in this act." 43 P.S. §802(e).

**Facts and Procedural History**

From April 20, 2018, to June 3, 2019, Claimant was employed by Street Track 'n Trail, Inc. (Employer) as a sales manager. (Referee Finding of Fact (F.F.) No. 1.) Employer terminated Claimant on a date and for a reason or reasons, which, as explained below, are not clear from the record. Claimant applied for UC benefits, and, on December 20, 2019, the local UC Service Center found Claimant ineligible for UC benefits under section 402(e) of the Law because it determined that Claimant had violated Employer's absenteeism and/or tardiness policy. (Certified Record (C.R.), Item No. 10.) Claimant appealed, and a referee conducted a hearing on January 21, 2020, at which Employer's General Manager, Debbie Lepley, Claimant, and Claimant's son, Andrew Fee, testified.

Ms. Lepley testified that Claimant took a day off on June 4, 2019, and asked another employee to cover for him, which surprised her because Claimant rarely took time off from work. (Notes of Testimony (N.T.) at 4.) Ms. Lepley then stated that "the morning of the 5th[, *i.e.*, June 5, 2019,] is when [Claimant did not go] in" and failed to call off. (*Id.*) She admitted that, "at that point," Claimant's son met with her at her office to inform her of the reason for Claimant's absence because Claimant was unable to do so himself. (*Id.*) Referring to the day on which Claimant "[did not go] in," Ms. Lepley testified that she had been texting Claimant that morning to ask if he had arrived at work, "because he was usually there about the same time [she] was[, which is] about 7:00 [a.m.]" (*Id.*) She then stated that Claimant's son called and asked to meet with her, and that they met "probably [around] 10:00 [a.m.] because [Claimant's son] was driving from where they live." (*Id.* at 4-5.) Ms. Lepley testified that, at their meeting, Claimant's son informed her that Claimant had been incarcerated following a hearing in Florida, and that it was not clear when Claimant would be free

to return to work because Ms. Lepley was not aware of the hearing in advance. (*Id.* at 5.) Ms. Lepley explained that Claimant's son kept her updated as to Claimant's status until Claimant himself was able to contact her via email approximately one week later. (*Id.*) When it became clear that Claimant would remain incarcerated, Employer sent a letter terminating his employment. (*Id.*)

Claimant testified that, after working on June 3, 2019, he took the day off and flew to Florida for a hearing on June 4, 2019. (*Id.* at 6.) He stated that he was incarcerated immediately following the hearing and remained so until October 6, 2019. (*Id.*) Claimant testified that his hearing occurred at 8:30 a.m. on June 4, that his attorney informed his wife of his incarceration at 10:49 a.m. that day, and that his wife informed his son, who then called Employer and met with Ms. Lepley that same day, *i.e.*, June 4, to inform her of Claimant's incarceration. (*Id.* at 6.) In support of this testimony, Claimant introduced telephone records for his wife's and son's phones. (*Id.*, Claimant's Exs. 1-2.)[3]

In response to Claimant's testimony, Ms. Lepley testified that she did not meet with Claimant's son in the evening on June 4 and, instead, stated that she met with Claimant's son "the next day because [their meeting] was in the morning." (*Id.*) She stated that when she called another employee to fill in for Claimant on the day he was absent, the employee was "grabbing coffee" and was "in his pajamas[,]" and based

---

[3] Specifically, the records from Claimant's wife showed that Claimant's attorney called her around 10:49 a.m. on June 4 and that she called Claimant's son. (N.T. at 6, Claimant's Ex. 1.) The records from Claimant's son reflected outgoing calls to Employer's place of business at 1:38 p.m. and 1:47 p.m. on June 4, and an incoming call at 4:16 p.m. on June 4. (*See* N.T. at 6, Claimant's Ex. 2.) Although Claimant suggested that the 4:16 p.m. call came from Ms. Lepley's cell phone, the Board correctly observes in its brief that the record does not identify the particular cell phone number that made the 4:16 p.m. call as belonging to Ms. Lepley. (Board's Br. at 10.)

3

on that, she stated: "I think [Claimant's son] had just been in and told me" about Claimant's incarceration. (*Id.*)

Finally, Claimant's son testified. He testified that, at approximately 11:00 a.m. on June 4, 2019, as corroborated by the phone records Claimant submitted, his mother called while he was at work and informed him of Claimant's incarceration. (*Id.* at 8.) He explained that he immediately left work and made several phone calls (including to his sister and some of Claimant's friends), and then began driving to Employer's place of business. (*Id.* at 8-9.) He confirmed that the three calls he made to Employer's office—one at 1:38 p.m. and two at 1:47 p.m.—were to inform Ms. Lepley that he was on his way to her office and desired to meet with her. (*Id.* at 9.) He explained that he made multiple calls to Employer because "it took a couple of attempts to get through" to Ms. Lepley because she was the general manager. (*Id.*) Claimant's son testified that during the first call at 1:38 p.m., which lasted approximately four minutes, he spoke with Employer's receptionist who told him Ms. Lepley was unavailable. (*Id.*) He stated that during two subsequent calls that started at 1:47 p.m. and lasted approximately one and three minutes, respectively, he spoke with Ms. Lepley and requested to meet with her concerning Claimant. (*Id.* at 10.) He recalled that, when they spoke on the phone, Ms. Lepley was concerned about Claimant because she had been texting Claimant all morning without response. (*Id.*) He did not discuss Claimant's incarceration on the phone, but stated that he preferred to speak with her in person when he arrived at Employer's office. (*Id.*) Ms. Lepley confirmed that the phone numbers involved in those three calls were associated with Employer's place of business. (*Id.* at 9.)

Claimant's son further testified that he met with Ms. Lepley in person at Employer's office on June 4 sometime between their second phone call around 1:47

4

p.m., and Ms. Lepley's 4:16 p.m. cell phone call to Claimant's son after the meeting had occurred. (*Id.* at 10.)

He explained that during the 4:16 p.m. call, Ms. Lepley followed up on their meeting and stated that, after speaking with Employer's owner, she decided to inform the other employees that Claimant was out sick because she did not want to publicize Claimant's incarceration. (*Id.*) In response to Ms. Lepley's testimony that their meeting did not occur until June 5, 2019, Claimant's son testified that such a meeting would have been impossible because he was at work all day on June 5. (*Id.*) In support of this claim, he emphasized the more than 20 calls in his phone records between 8:44 a.m. and 5:29 p.m. on June 5, each of which showed his phone's physical location as Beaver Falls, Pennsylvania, where his workplace is located. (*Id.* at 10-11; Claimant's Ex. 2.)

Following Claimant's son's testimony, the referee asked Ms. Lepley whether she had any questions for him, and she responded, "I do not." (*Id.* at 11.) Recalling her earlier confusion over the sequence of events surrounding the 4:16 p.m. call on June 4, the referee asked Ms. Lepley if the order of events "make[s] sense now." (*Id.*) She offered the following response:

> It does, looking at this call log. But, [Claimant's son] did say I was texting his dad's phone, asking if he was okay. I didn't even know he was going to be off on the 4th. But, he had someone cover for him that day, and he was allotted a day off. He just never took his day off.

(*Id.*) Ms. Lepley also did not object to Claimant's wife's and son's phone records being entered into evidence. (*Id.*) Claimant's son then clarified his earlier statement and pointed out that he did not have access to Claimant's phone until June 7 or 8, when he flew to Florida to retrieve some of Claimant's belongings. (*Id.* at 12.)

Based on the evidence presented at the hearing, the referee made the following findings of fact:

1. [Claimant] was last employed with [Employer] from April 20, 2018, to June 3, 2019, as sales manager at a weekly salary of $1[,]303.85 plus commission.

2. According to [Employer's] call-off policy, if an employee is going to be late to work or unable to report to work as scheduled, [the employee] should notify [his] supervisor as soon as possible in advance of the absence.

3. [Claimant] signed an acknowledgement of receipt of the employee handbook when he was hired.

4. [Claimant] flew to Florida the evening of June 3, 2019 . . . .

5. [Claimant] was not scheduled to work [on] June 4, 2019, and he had a hearing that morning in Florida.

6. [Claimant] thought he would get probation and instead, he was sentenced to be incarcerated for six months.

7. [Claimant] had a flight booked to return home [on] June 4.

8. [Claimant's] attorney called [Claimant's] wife at 10:49 AM on June 4, to let her know that [Claimant] had been sentenced to six months of incarceration.

9. [Claimant's] wife spoke to their son, Andrew [Fee], about the situation around 11:00 AM and after he left work, he went home and made some calls to some of [Claimant's] close friends and [Claimant's] therapist.

10. [Claimant's son] called [Employer] at 1:38 PM [on] June 4, to talk to Debbie Lepley, the [G]eneral [M]anager, and she was not available.

11. On June 5, [Claimant] did not report to work.

12. [Claimant] was usually there early and when he did not report, Ms. Lepley texted [Claimant].

13. [Claimant's] son had [Claimant's] phone and he asked Ms. Lepley if he could come in and talk with her.

14. [Claimant's] son went in around 10:00 AM and he told Ms. Lepley that [Claimant] had a hearing in Florida [on] June 4, he was incarcerated[,] and [Claimant's son] had no idea how long [Claimant] would be there.

15. [Claimant] e-mailed Ms. Lepley about a week later and said he was still in Florida.

16. Ms. Lepley had no idea [Claimant] was going to Florida . . . .

17. On June 6, 2019, [Claimant's] son went to Orlando where he met with [Claimant's] attorney and he was given his father's belongings.

18. [Claimant] kept in contact with Ms. Lepley through e-mails while he was in jail.

19. [Employer] . . . decided to not allow [Claimant] to return to work due to the reasons he was incarcerated.

20. [Claimant] was also in violation of the attendance policy.

21. [Employer] had to find a new manager to replace [Claimant].

22. [Claimant] served 129 days and he was released October 6, 2019.

(Referee F.F. Nos. 1-22.)

From these findings, the referee concluded that Claimant was ineligible for UC benefits. In so concluding, the referee credited Employer's testimony that Employer has a call-off policy, stating that an employee must notify his supervisor as soon as possible prior to any absence, and that Claimant failed to follow this policy on June 5, 2019, due to his incarceration. (C.R., Item No. 15 at 3.) The referee then

observed that "post-conviction imprisonment is not good cause for absence from work[,]" and that it was Claimant's failure to attend work, not any criminal conduct, that constituted willful misconduct. (*Id.*) The referee further observed that Employer prohibited Claimant from returning to work based not only on his violation of the attendance policy, but also due to the reasons for his incarceration. (*Id.*) Accordingly, the referee concluded that Employer met its burden of establishing that Claimant was discharged for willful misconduct.

Claimant timely appealed to the Board, which affirmed the referee in a decision and order mailed April 2, 2020. The Board adopted and incorporated the referee's findings of facts and conclusions of law as its own; however, it replaced the referee's Finding of Fact No. 13 with the following finding: "On June 5, 2019, [Claimant's] son asked [Ms. Lepley] if he could meet with her." (Board decision at 1.) The Board then noted that the telephone records and other documents that Claimant attached to his brief could not be considered because they were not part of the record. (*Id.*) The Board also observed that the telephone records that were part of the record were not necessarily inconsistent with the referee's findings. Specifically, the Board pointed out that the telephone records admitted into evidence established that Claimant's son attempted to contact Ms. Lepley on June 4, 2019, not that he actually spoke with her. However, those records did not establish that it was impossible for Claimant's son to have met with Ms. Lepley on June 5 and then to have worked for the remainder of that day, as Ms. Lepley testified that Claimant's son first contacted her on June 5, 2019. The Board, therefore, resolved the conflicts in the testimony in Employer's favor and found Ms. Lepley's testimony to be credible. (*Id.*)

The Board next rejected Claimant's argument that the referee erred by mentioning Claimant's incarceration as a reason for his discharge, explaining that

8

Employer discharged Claimant because he failed to call off work and because he was absent from work, and that the referee properly noted that incarceration is not good cause for an absence from work. (*Id.* at 2.) Finally, the Board observed that it could not consider Claimant's argument that Employer did not consistently enforce its call-off policy, because Claimant did not introduce evidence of inconsistent enforcement or identify which policies were not consistently enforced. Accordingly, the Board held that Claimant was ineligible for benefits under section 402(e) of the Law. Claimant now petitions this Court for review of the Board's order.[4]

On appeal, Claimant argues[5] that the Board erred in concluding that he committed willful misconduct. Specifically, he claims that the Board acted arbitrarily and capriciously in finding Ms. Lepley's testimony that Claimant's son met with her on June 5, 2019, to be more credible than Claimant's and his son's testimony and evidence to the contrary, where Employer's testimony was contradictory and Claimant

---

[4] Our review of the Board's order "is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated." *Johns v. Unemployment Compensation Board of Review*, 87 A.3d 1006, 1009 n.2 (Pa. Cmwlth. 2014).

In UC cases, the Board's findings of fact must be supported by "[s]ubstantial evidence[, which] is defined as 'such relevant evidence which a reasonable mind would accept as adequate to support a conclusion.'" *Western & Southern Life Insurance Co. v. Unemployment Compensation Board of Review*, 913 A.2d 331, 335 (Pa. Cmwlth. 2006) (quoting *Guthrie v. Unemployment Compensation Board of Review*, 738 A.2d 518, 521 (Pa. Cmwlth. 1999)). "The Board's findings are conclusive on appeal so long as the record, when viewed in its entirety, contains substantial evidence to support the findings." *Id.* This Court is bound "to examine the testimony in the light most favorable to the party in whose favor the Board has found, giving that party the benefit of all inferences that can logically and reasonably be drawn from the testimony[,]" to determine if substantial evidence exists for the Board's decision. *United States Banknote Co. v. Unemployment Compensation Board of Review*, 575 A.2d 673, 674 (Pa. Cmwlth. 1990).

[5] We have summarized Claimant's arguments on appeal for brevity and clarity. Specifically, Claimant challenges Findings of Fact Nos. 10, 12-15, and 20, which form the basis for the Board's conclusion that Claimant committed willful misconduct. Claimant also challenges Finding of Fact No. 13, as modified by the Board on appeal.

9

offered additional evidence to rebut Employer's testimony. Claimant further argues that the Board erred in refusing to consider Claimant's phone records, which Claimant alleges could not have been presented any earlier than in his appeal to the Board. He also claims that the referee erred in failing to assist Claimant with the presentation of evidence regarding Employer's alleged inconsistent enforcement of its call-off policy. Claimant contends that the referee and the Board erred in discussing Claimant's incarceration, which, Claimant maintains, is not relevant to his alleged misconduct. Claimant also appears to argue that he made a good faith effort to notify Employer of his absence as soon as possible. We will address each of Claimant's arguments in turn.

## Discussion

Initially, we note that section 402(e) of the Law provides that an employee shall be ineligible for UC benefits for any week in which his unemployment is due to willful misconduct connected to his work. 43 P.S. §802(e). Willful misconduct is defined as (1) a wanton and willful disregard of an employer's interests; (2) a deliberate violation of an employer's rules; (3) a disregard of the standards of behavior that an employer can rightfully expect from an employee; or (4) negligence showing an intentional disregard of the employer's interest or the employee's duties and obligations. *Grieb v. Unemployment Compensation Board of Review*, 827 A.2d 422, 425 (Pa. 2003). When the discharge is based on a rule violation, the employer must prove the existence of the rule, its violation, *Ductmate Industries, Inc. v. Unemployment Compensation Board of Review*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008), and "whether the rule or policy is reasonable in light of all the circumstances," *Spirnak v. Unemployment Compensation Board of Review*, 557 A.2d 451, 453 (Pa. Cmwlth. 1989). Reasonableness is determined by "consider[ing] whether application

10

of the rule or policy under the circumstances is fair and just and appropriate to accomplish a legitimate interest of the employer." *Spirnak*, 557 A.2d at 453. The employer must also establish that the claimant was aware of the work rule. *Bruce v. Unemployment Compensation Board of Review*, 2 A.3d 667, 671 (Pa. Cmwlth. 2010). Whether a claimant's conduct constitutes willful misconduct is a question of law fully reviewable by this Court on appeal. *Temple University of the Commonwealth System of Higher Education v. Unemployment Compensation Board of Review*, 772 A.2d 416, 418 n.1 (Pa. 2001).

If the employer satisfies its burden, the burden then shifts to the claimant to show that he had good cause for his actions. *McKeesport Hospital v. Unemployment Compensation Board of Review*, 625 A.2d 112, 114 (Pa. Cmwlth. 1993). "Whether a claimant has good cause to violate an employer's rule or policy is a question of law subject to this [C]ourt's review and should be viewed in light of all of the attendant circumstances." *Docherty v. Unemployment Compensation Board of Review*, 898 A.2d 1205, 1208 (Pa. Cmwlth. 2006). "A claimant has good cause if his . . . actions are justifiable and reasonable under the circumstances." *Id.* at 1208-09.

Claimant first argues that the Board erred and abused its discretion in finding that Claimant violated Employer's call-off policy on June 5, 2019, and, thus, committed willful misconduct. Claimant does not dispute the existence of Employer's call-off policy, which the Board found requires employees to "notify their supervisor as soon as possible in advance of [their] absence [from work,]" or his awareness of the policy. (F.F. Nos. 2 & 3.) Rather, Claimant disputes only whether he violated the policy. In this regard, he contends that the Board should have credited his and his son's testimony that his son met with Ms. Lepley on June 4, 2019, and thus notified her of Claimant's incarceration on that date in accordance with Employer's call-off policy,

11

and that Ms. Lepley's testimony to the contrary is not credible and is not substantial evidence. In response, the Board emphasizes that it credited Ms. Lepley's testimony that Claimant's son first contacted her on June 5, 2019, over the contrary testimony of Claimant and his son, and that Ms. Lepley's testimony constitutes substantial evidence to support the finding that Claimant's son did not meet with Ms. Lepley until June 5, 2019.

With regard to Claimant's contention that his son called off for him on June 4, 2019, the day before his absence from work due to his incarceration, Claimant is essentially asking this Court to adopt his preferred version of the facts. While Claimant and his son did provide testimony that would support Claimant's contentions, the Board found that Claimant's son did not meet with Ms. Lepley and inform her of Claimant's incarceration and resulting absence until after Claimant was to report to work on June 5, 2019, and, in doing so, the Board resolved all conflicts in the evidence presented in favor of Employer, which it was empowered to do. We note that it is well-settled that the Board is the ultimate factfinder in UC cases and is, thus, empowered to make credibility determinations and resolve conflicts in the evidence presented. *Curran v. Unemployment Compensation Board of Review*, 752 A.2d 938, 940 (Pa. Cmwlth. 2000). Although Claimant and his son may have given "a different version of the events, or . . . might view the testimony differently than the Board, [this] is not grounds for reversal if substantial evidence supports the Board's findings." *Tapco, Inc. v. Unemployment Compensation Board of Review*, 650 A.2d 1106, 1108-09 (Pa. Cmwlth. 1994).

We acknowledge that absence from work due to incarceration is not necessarily willful misconduct. *Hawkins v. Unemployment Compensation Board of Review*, 472 A.2d 1191, 1192 (Pa. Cmwlth. 1984). However, if the claimant fails to

12

notify the employer about the absence in violation of a work rule, the absence may constitute willful misconduct as a matter of law. *Anderson v. Unemployment Compensation Board of Review*, 564 A.2d 1046, 1047 (Pa. Cmwlth. 1989). Here, the Board's finding that Claimant's son first met with Ms. Lepley on June 5, 2019, is supported by substantial evidence. Ms. Lepley testified that it was "the morning of the 5th" that Claimant did not arrive at work, and that Claimant's son did not meet with her to inform her of his incarceration until later that same day. The Board chose to credit Ms. Lepley's testimony over the contrary testimony offered by Claimant concerning when the meeting took place, and we will not disturb that credibility determination on appeal. *See Western & Southern Life Insurance Co. v. Unemployment Compensation Board of Review*, 913 A.2d 331, 335 (Pa. Cmwlth. 2006). Based on the facts as found by the Board, Claimant's son did not actually inform a representative of Employer about Claimant's incarceration until *after* he was due to report to work on June 5, 2019, in violation of Employer's call-off policy. Accordingly, the Board did not err in concluding that Claimant engaged in willful misconduct under these circumstances.

The Board also acknowledged, however, that "[C]laimant's son attempted to contact Employer on June 4." (Board decision at 1.) The record shows that Claimant's son attempted to contact Employer on June 4, before Claimant was expected to be at work on June 5, 2019. Specifically, Claimant introduced testimony and his wife's and son's phone records showing that his son made several phone calls to Employer's place of business on June 4. The Board found, as fact, that those calls occurred, (F.F. Nos. 8-10), and Ms. Lepley admitted that the numbers appearing in the records were associated with Employer. (N.T. at 9.) Although Ms. Lepley denied meeting with Claimant's son on June 4, she did not deny that he made several attempts

13

to contact her on that date. She also testified that, after June 5, Claimant's son regularly contacted her regarding Claimant, and that Claimant himself contacted her via e-mail within approximately one week of his unexpected incarceration. (*Id.* at 5.) Ultimately, this evidence pertains to Claimant's efforts to contact Ms. Lepley, which, as discussed below, may be relevant for the Board's consideration on remand as to whether Claimant had good cause for violating Employer's policy.

Additionally, we note that the Board's decision suggests that Claimant committed another act of willful misconduct, separate from his violation of the call-off policy. Specifically, the Board suggests that Claimant's extended absence from work alone was willful misconduct as a matter of law. When a claimant's incarceration causes an extended absence from work, the resulting absence can constitute willful misconduct, regardless of whether an attendance policy applies. *Medina v. Unemployment Compensation Board of Review*, 423 A.2d 469, 470-71 (Pa. Cmwlth. 1980). This depends, however, on a variety of factors that apply in all cases where extended absence is the asserted reason for termination. *See id.* (citing *Pettey v. Unemployment Compensation Board of Review*, 325 A.2d 642 (Pa. Cmwlth. 1974)). One pertinent factor is whether the claimant has good cause for his absence, which, in the incarceration context, turns on whether the incarceration resulted from willful criminal conduct of which the claimant is convicted. *Miller v. Unemployment Compensation Board of Review*, 131 A.3d 110, 113-15 (Pa. Cmwlth. 2015) (comparing case in which the claimant was incarcerated before trial and later acquitted with cases in which the claimants were ultimately convicted of criminal offenses, thus demonstrating that their incarceration was culpable). If, based on an adjudication of guilt by a criminal trial court, the claimant's incarceration was his own fault, he cannot

14

claim good cause for the resulting absence. *See id.* at 114; *Wertman v. Unemployment Compensation Board of Review*, 520 A.2d 900, 901 (Pa. Cmwlth. 1987).

The record in the instant matter contains conflicting evidence regarding both the date of, and the reason for, Claimant's discharge. The ambiguity begins with Employer's Notice of Application, in which Employer stated that Claimant last worked on June 3, 2019, and, without further elaboration, that "[h]e was incarcerated." (C.R. at 8.) In this document, Employer did not refer to the call-off policy or state the date of Claimant's termination (whether on June 5 or thereafter). In its initial separation statement, Employer stated that Claimant's "discharge day was June 4, 2019[,]" because "[h]e was a no call, no show" on that date.[6] (*Id.* at 18.) Employer expressly referenced the call-off policy and explained that the paychecks Claimant received "after his last day[,]" issued between June 12 and July 3, 2019, were for a partial week's pay and reimbursement for bonuses, prepaid insurance, and unused vacation time. (*Id.* at 18-19.) In a subsequent interview, however, Employer changed course, stating that Claimant's last day of work was July 1, 2019. (*Id.* at 22.) In the same interview, Employer gave two reasons for Claimant's discharge: "[h]e was incarcerated," and "[h]e was discharged for a violation of [the call-off] policy." (*Id.*) Employer did not clarify whether its reference to Claimant's incarceration meant that it terminated him for his extended absence and unavailability (as might be suggested by the stated July 1 termination date). Finally, in a second separation statement, Employer listed Claimant's "last date worked" as July 1, 2019, his "last absence" as July 2, 2019, and his date of discharge as "[n]ot sure—he was out of area." (*Id.* at 25.) Employer indicated that Claimant was discharged for "[a]bsenteeism," but also stated that Claimant did not properly follow the call-off procedure for the absence, that employees

---

[6] Employer later corrected this error, admitting that Claimant first missed work on June 5, not June 4. (C.R. at 29.)

"[h]ave to call off before their start time (8 AM)[,]" and that Claimant "did not call off due to being incarcerated. His son I believe called him off at a later date[.]" (*Id.* at 25-26.) Once again, Employer did not clarify whether it discharged Claimant based solely on his violation of the call-off policy, or also because of his continuing unavailability due to his incarceration.

Employer's hearing testimony did not resolve these contradictions. Ms. Lepley, Employer's only witness, never directly stated when or why Employer terminated Claimant. Contrary to some of the prehearing statements, but consistent with others, she indirectly suggested that Employer terminated Claimant well after June 5 for reasons independent of the call-off policy. Specifically, Ms. Lepley stated that she "[did not] have a manager" because Claimant "[was not] available for work." (C.R. at 59.) She explained that, at some point following Claimant's incarceration, Employer retrieved one of its vehicles that Claimant had left at the airport before traveling to Florida. The referee then asked whether Employer terminated Claimant at that point, to which Ms. Lepley responded: "Well, yeah. I mean, there was no—we then sent him a letter terminating him. But, I had to find a new manager and I don't think he got out of prison until the end of October, maybe." (*Id.* at 60.) Ms. Lepley did not clarify the date on which Employer allegedly sent the termination letter. Later in her testimony, Ms. Lepley gave a different account, stating that she told Claimant *after* his release from incarceration that "because of the reasons that he was incarcerated, [Employer] would not allow him to come back. And, we had hired someone else, at that point." (*Id.* at 68.)

Thus, the record contains two contradictory explanations by Employer of when and why it terminated Claimant. On one hand, Employer claims it terminated him when, and because, he violated the call-off policy on June 5, 2019. On the other

16

hand, Employer asserts it did not terminate him until some point in July 2019, because of his continuing absence due to his incarceration. Employer's prehearing statements support both propositions. Under Pennsylvania law, "[a]n employer is bound by its stated reasons for an employee's dismissal and cannot raise new reasons at the hearing." *Scott v. Unemployment Compensation Board of Review*, 105 A.3d 839, 845 (Pa. Cmwlth. 2014) (citing *Ductmate Industries, Inc.*, 949 A.2d at 344 n.5). This doctrine does not resolve the ambiguity here, however, which is evident in Employer's prehearing statements. Although Employer could not raise a new ground for termination at the hearing, it could have clarified the meaning of its prehearing statements. Instead, the hearing testimony added more confusion, with Employer first stating that it terminated Claimant by letter, but later stating that it informed him he was terminated after his release from incarceration.[7]

Claimant raised this very ambiguity in his appeal to the Board, arguing that Employer's prehearing statements "only speak[] to the violation of the call-off policy," and that his incarceration, independent of the policy, "was never raised as a reason for termination." (C.R. at 86.) Despite this, the Board did not expressly resolve the conflicting statements regarding the date of and reason for Claimant's termination. First, the underlying findings of fact, made by the referee and incorporated by the Board, do not definitively state why or when Claimant was terminated. Several of the facts found might suggest reasons for termination, including that Employer decided not to allow Claimant to return "due to the reasons he was incarcerated," that Claimant "was also in violation of the attendance policy," that Employer "had to find a new manager," and that Claimant was incarcerated for 129 days. (F.F. Nos. 19-22.)

---

[7] Additionally, Ms. Lepley's testimony could plausibly be understood to set forth a third reason for Claimant's discharge: "the reasons [for which Claimant] was incarcerated," *i.e.*, the underlying conduct that resulted in his incarceration. (C.R. at 68.)

17

However, the Board never affirmatively stated the factual reason as to *why* Claimant was discharged or the date of his discharge. Further, the referee's finding, as incorporated by the Board, that "[C]laimant was last employed . . . [on] June 3, 2019," does not constitute such a finding, since the earliest date he could have been terminated was June 5, 2019. After it incorporated these findings, the Board modified one finding unrelated to this ambiguity, and did not resolve the ambiguity. In response to Claimant's argument on this issue, the Board offered only the following reasoning:

> [C]laimant also argues that his failure to call off was the only reason that [E]mployer] discharged him. He argues that the [r]eferee erred by referring to his incarceration. This is inaccurate because . . . [E]mployer discharged him because he did not call off *and* he was absent from work. The [r]eferee properly noted that incarceration is not good cause for an absence.

(Board's decision at 2 (emphasis in original).)

It is the role of the Board, not this Court, to resolve conflicting evidence by making necessary credibility determinations and factual findings. *Wise v. Unemployment Compensation Board of Review*, 111 A.3d 1256, 1262-63 (Pa. Cmwlth. 2015). As we have recently held:

> [I]n UC cases, "it is well-settled that the Board is the ultimate fact finder and is, therefore, entitled to make its own determinations as to witness credibility and evidentiary weight." *Serrano v. Unemployment Compensation Board of Review*, 149 A.3d 435, 439 (Pa. Cmwlth. 2016) (citing *Peak v. Unemployment Compensation Board of Review*, . . . 501 A.2d 1383, 1388 ([Pa.] 1985)). "The Board is also empowered to resolve conflicts in the evidence." *Id.* "'Questions of credibility and the resolution of evidentiary conflicts are within the sound discretion of the Board, and are not subject to re-evaluation on judicial review.'" *Id.* (quoting *Peak*, 501 A.2d at 1388).
>
> . . . .

18

Moreover, "*[t]his Court's review of a decision by the Board does not permit it to reweigh the evidence or substitute its own findings for those made by the Board.*" *Chartiers Community Mental Health and Retardation Center v. Unemployment Compensation Board of Review*, 134 A.3d 1165, 1172-73 (Pa. Cmwlth. 2016).

*Cambria County Transit Authority ("CamTran") v. Unemployment Compensation Board of Review*, 201 A.3d 941, 947 (Pa. Cmwlth. 2019) (emphasis added).

In failing to make clear findings concerning when and why Claimant was terminated, the Board failed to resolve the conflicts on those points in the record. The Board's statement that Claimant was terminated "because he did not call off *and* he was absent from work" does not account for and resolve Employer's contradictory statements. Employer sometimes stated that it terminated Claimant for one reason, and sometimes for another reason. Furthermore, the Board's statement is itself ambiguous: it does not identify the date on which Employer terminated Claimant, and it does not explain why Claimant's absence was relevant (whether because it triggered the call-off policy, or separately, because Claimant was unavailable for an extended period). The balance of the Board's decision contains findings relevant to both theories of willful misconduct, without any finding about which theory was, as a matter of fact, the one on which Employer relied. The Board also failed to determine the date on which Employer actually terminated Claimant, which would have assisted in determining the reason therefor. The Board, not this Court, must make these factual determinations, and we will remand this matter so that it may do so.

Our interest in these findings is not academic. If, on remand, the Board finds that Employer discharged Claimant on June 5, 2019, Claimant's behavior after that date is simply irrelevant. Obviously, Employer cannot claim that it discharged Claimant for excessive absences if, in fact, it terminated him on June 5, the first day

19

that he was absent, on the ground that Claimant failed to properly call off prior to the start of his shift on that date. If the Board so finds, the only relevant misconduct is Claimant's violation of the call-off policy. Given our conclusion here that Employer successfully showed that Claimant engaged in willful misconduct, the burden shifted to Claimant to show good cause for his actions, and the Board must engage in that inquiry. *McKeesport Hospital*, 625 A.2d at 114. We acknowledge the Board's reasoning that Claimant's incarceration did not, in itself, constitute good cause for his violation of the call-off policy. *See Nunez v. Unemployment Compensation Board of Review*, 480 A.2d 379, 382 (Pa. Cmwlth. 1984). But that is not the end of the inquiry. We have applied that rule only in circumstances where an incarcerated claimant "could have requested that his attorney [or another person] notify the [e]mployer of his anticipated absence from work," but failed to do so. *Id.*; *accord Eliscar v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 157 C.D. 2017, filed Nov. 3, 2017), slip op. at 8 (observing that the claimant did not "employ[] any alternative form of communication, such as having another person call in on his behalf").[8] Indeed, the good cause inquiry involves much more than the simple fact of Claimant's incarceration, and determines whether Claimant's attempts to comply with the policy by having family members inform Employer of his incarceration were "justifiable and reasonable under the circumstances." *Docherty*, 898 A.2d at 1208-09. Given the Board's failure to find that Claimant's policy violation was the actual basis for his discharge, it would be premature for us to assume such a finding and engage in a good cause analysis in the first instance.

---

[8] *Eliscar* is an unreported panel decision, which, under our Internal Operating Procedures, may be cited for its persuasive value, but not as binding precedent. *See* section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

If, on the other hand, the Board finds that Claimant was discharged after his prolonged absence, the good cause analysis we have outlined may not be necessary. If the Board so finds, Claimant's inability to attend work for many days, due to his ongoing incarceration, might provide an independent basis on which to conclude that Claimant engaged in willful misconduct. *See Miller*, 131 A.3d at 113-14. Another possibility is that, after reconciling the conflicts in the record, the Board may find as fact that Employer terminated Claimant for two separate acts of willful misconduct, *i.e.*, for violating a work rule *and also* for his extended absences. But the Board would need to make such a finding explicitly. It would also need to find a termination date that is consistent with both grounds, *i.e.*, a date sometime after June 5, 2019. Here, it did neither.

Because our (and the Board's) analysis will vary markedly depending upon these findings, we will not engage in further appellate review or speculation about the outcome of this matter. We will, instead, permit the Board to resolve the conflicts within the record concerning the date of, and reason for, Claimant's termination, and to apply the law to those findings. Only then can we engage in effective appellate review. Accordingly, we vacate the Board's order and remand this matter for further proceedings consistent with this opinion.

_____

PATRICIA A. McCULLOUGH, Judge

21

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Steven E. Fee,                                    :
               Petitioner        :
                                :   No.  405 C.D. 2020
          v.                 :
                                :
Unemployment Compensation                         :
Board of Review,                                  :
               Respondent       :

## *ORDER*

AND NOW, this 3rd day of May, 2021, the April 2, 2020 decision of the Unemployment Compensation Board of Review (Board) is vacated, and this matter is remanded to the Board for further proceedings in accordance with the attached opinion.

Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge

Steven E. Fee, : 
          Petitioner : 
           : 
      v. : 
           : 
Unemployment Compensation : 
Board of Review, :   No. 405 C.D. 2020
          Respondent :   Submitted: September 11, 2020

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

CONCURRING OPINION
BY JUDGE FIZZANO CANNON          FILED: May 3, 2021

I concur that a remand of this matter to the Unemployment Compensation Board of Review (Board) is necessary, in order to allow the Board to resolve conflicting factual evidence concerning the actual date when the employment of Steven E. Fee (Claimant) terminated and the reason or reasons for the termination. I write separately to emphasize that our remand is limited to a determination on those two issues and, if appropriate, a determination of whether Claimant had good cause for engaging in willful misconduct. *See Marshall v. Commonwealth*, 197 A.3d 294, 306 (Pa. Cmwlth. 2018), *aff'd*, 214 A.3d 1239 (Pa. 2019) (where a remand is for a specific limited purpose, issues not encompassed by

the remand order may not be addressed; a remand does not give a litigant "a proverbial second bite at the apple") (additional citations and internal quotation marks omitted).  The narrow issues remaining to be addressed on remand do not include any of the findings of fact already made by the Board, which this Court has accepted in full as supported by substantial evidence and which should not be reweighed on remand.  Those findings of fact include, without limitation, the date, time, and circumstances under which Claimant's son first notified Claimant's employer, Street Track 'n Trail, Inc., that Claimant would not report to work on June 5, 2019.  Inasmuch as this Court has accepted the Board's findings, the majority's recitation of the conflicting record evidence cannot be read as disagreeing with or overriding either the Board's credibility determinations or its resolution of those evidentiary conflicts in its original decision.

_____

CHRISTINE FIZZANO CANNON, Judge